# Staunton

## JOHN HURD v. THE COMMONWEALTH.

September 22, 1932.

Present, Campbell, C. J., and Holt, Hudgins, Gregory and Chinn, JJ.

The opinion states the case.

*D. F. Kennedy, L. P. Summers* and *G. B. Johnson,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

HUDGINS, J., delivered the opinion of the court.

John Hurd was found guilty, as principal in the second degree, of murder in the first degree and sentenced to twenty years' confinement in the penitentiary. He contends that the judgment of the trial court should be reversed and the verdict of the jury set aside because of three errors committed during the progress of the trial.

The errors assigned are: (1) The refusal of the court to sustain a demurrer to the indictment; (2) the refusal of the court to set aside the verdict on the ground that two of the jurors were disqualified; (3) the evidence was insufficient to sustain the verdict. These will be treated in the order named.

There are three counts in the indictment. The first and second counts are in the form prescribed by Code, section 4865, as amended by acts 1930, chapter 238, for the charge of murder. The first count charges Bill and John Hurd jointly with the killing of Grover Gray. The second count charges Bill Hurd, only, with the killing. The third and last count charges that John Hurd was "present, counselling, aiding, abetting and assisting" Bill Hurd in the killing of the deceased. The grounds of demurrer is that the indictment fails to inform the defendant of the cause and nature of the accusation, as provided by section

8 of the Bill of Rights. It is also contended that the indictment does not specifically charge the elements of murder in the first degree.

The forms of indictment for murder and manslaughter set out in Code, section 4865, as amended by the Acts of 1930, chapter 238, were recommended to the legislature by the judicial council and the Virginia State Bar Association. See Judicial Council Report for 1930, page 115, and Minutes of the Virginia State Bar Association, vol. 41, page 116; American Law Institute Code of Criminal Procedure, sections 157, 159. The object of these forms of indictment was to eliminate the excessive verbiage used in the old common law forms and to substitute therefor a short, simple statement of the offense charged.

The separate degree of murder originated in the act of December 15, 1796, the preamble to which reads:

"And whereas, the several offenses which are included under the general denominations of murder, differ so greatly from each other in the degree of their atrociousness, that it is unjust to involve them in the same punishment:"

The act classified murder in the first and second degree substantially as now defined by Code, section 4393, and the punishment was fixed according to the degree of atrociousness or extenuation under which the offense was committed. While the punishment for murder in the second degree was reduced, this court has consistently held that an indictment charging murder is sufficient to sustain a conviction of murder in the first degree.

"In the case of *Thompson* v. *Com.*, 20 Gratt. [61 Va.] 724, 730, the court says: 'It is not necessary, in consequence of the statute defining the different degrees of murder, and subjecting them to different punishments, to alter the form of indictments for murder in any respect, nor to charge specially such facts as would show the offense to be murder in the first degree.'

"If, therefore, any proposition of law can be considered as settled by decision and no longer open to debate, this is one of them." *Kibler* v. *Commonwealth,* 94 Va. 807, 26 S. E. 858, 859. See also, *Wicks* v. *Com.,* 2 Va. Cas. (4 Va.) 387; *Com.* v. *Miller,* 1 Va. Cas. (3 Va.) 310; *Livingston* v. *Com.,* 14 Gratt. (55 Va.) 592.

■ When, therefore, an indictment charges murder, the accused is informed of the cause and nature of his accusation, although he is not informed of the particulars of the offense—*i. e.,* the time of day, the means or instrument, and the pertinent circumstances under which the killing occurred. If this information is desired by the accused, under the ruling of *Pine* v. *Commonwealth,* 121 Va. 812, 93 S. E. 652, he has a right to require the Commonwealth to file a bill of particulars.

■ The second assignment of error is based on the refusal of the court to set aside the verdict because two of the jurors, Frank Rasnick and Roy Cumbo, were related to the deceased, or his wife, and because Cumbo had formed and expressed an opinion prejudicial to the accused before he was accepted as a juror. Fourteen affidavits were filed by the accused to prove his accusation against the jurors. Eight of these affidavits, however, are confined to the good reputation of R. B. Irick and D. O. Murphy, two of the affiants, who claimed to have heard the statements made by the juror. The Commonwealth introduced nineteen affidavits and four witnesses who testified *ore tenus* before the court on the hearing of the motion. The substance of this evidence is that there might have been, and probably was, a distant connection between the deceased, his wife and the jurors, but the jurors were unaware of this fact at the time they were accepted for service.

While there is conflict in the evidence, the reasonableness of the testimony of the witnesses for the Commonwealth leads to the belief that neither of the jurors voiced an expression of opinion as to the guilt or innocence of

the accused before they were examined on their *voir dire.* This brings the decision of this assignment under the influence of the doctrine declared in the cases of *Cox* v. *Commonwealth,* 157 Va. 900, 162 S. E. 178; *McElroy* v. *Commonwealth,* 153 Va. 877, 149 S. E. 481; *Allen* v. *Commonwealth,* 122 Va. 834, 94 S. E. 783, and cases there cited.

The third and last assignment of error is based on the refusal of the court to set aside the verdict because the evidence is insufficient to support the verdict.

The learned Attorney General contends that this assignment cannot be considered because the evidence is not properly identified. As printed, the record is very confusing but on examination of the original record as presented to this court, we find the identification sufficient.

The trial judge, in his certificate to bill of exceptions Number 1, states: "Be it remembered, and the court doth certify, that the following evidence, beginning on page 1 and ending on page 175, is the evidence and all the evidence both for the Commonwealth and the defendant in the case of the Commonwealth against John Hurd."

Following this certificate, is found the typed evidence with the pages numbered consecutively from 1 to 175. The final certificate of the judge to all three bills of exceptions states that the evidence beginning on page 1 and ending on page 175 is designated and known as bill of exceptions No. 1, and constitutes a part of the record in the case. These certificates clearly indicate just what was before the judge at the time he signed the bills of exceptions.

The clerk, in preparing the transcript of the record numbered the pages consecutively and disregarded the separate paging of the evidence as it appeared in bill of exceptions No. 1. Copies of court orders were erroneously intermingled with each bill of exceptions, which added to the confusion; but, as stated, the trial judge certifies that the evidence began on page 1 and ended

on page 175 as found in bill of exceptions No. 1, and the original record appears as certified by the judge.

█ In view of the verdict of the jury, the evidence will be stated in the light least favorable to the accused.

It appears that Bill Hurd, the son of John Hurd, asked Grover Gray to take his tobacco to Abingdon, there to be sold on the open market. In unloading the tobacco in Abingdon a dispute arose between Grover Gray and Bill Hurd as to the ownership of one basket and sharp words were exchanged between the parties. For some reason it was decided to carry the tobacco away from Abingdon.

Bill Hurd requested Banner Gray, who drove the truck from Abingdon, to stop at Cowan Rose's and there unload his tobacco. He preceded the truck to that point and when he saw it coming waved for it to stop, but the speed was increased and it passed by him. He then hired a car and overtook the truck near Mrs. Walter Moore's mill and threatened to strike Banner Gray with a rock if he did not stop and let him have his tobacco. After further argument between him and Banner Gray he succeeded in getting his tobacco, including the basket the ownership of which was in dispute, off the truck and stored it in the mill.

On the following morning Grover Gray sent Orbey Hawkins to request Bill Hurd to come to the mill. When Bill Hurd and Hawkins arrived they found Grover Gray and Banner, his brother, in the room in which the tobacco was stored and that in dispute scattered on the floor. Grover Gray said to Hurd that it seemed he had gotten the tobacco mixed, to which Hurd replied, with an oath, that it was his tobacco for he had bought it, and began putting it in the basket. Banner Gray picked up a two by four scantling and said he would "burst Hurd's brains out" if he touched any more of the tobacco, and Hurd left, cursing. The Gray brothers and Orbey Hawkins remained at the mill repairing the building, fixing the

door so it could be locked, although it had not been locked for six months prior thereto. It seems that Walter Moore, who had been running, or using, the mill property, had died a few months prior to the time of this difficulty and his widow had continued in possession, using the upper story as living quarters. The Gray brothers owned the property, but this fact was unknown to Bill Hurd. There were five baskets of tobacco in the mill and Bill Hurd's right to four of them was unquestioned, ownership of the fifth, only, being in dispute.

Within three-quarters of an hour after Bill Hurd left the mill he returned accompanied by his father, John Hurd, a man sixty-five years of age. When the Hurds entered the room where the tobacco was stored Grover Gray and his companions were still there. John Hurd exchanged greetings with these parties. Mrs. Moore left the room as the Hurds entered and stood on the stairway with her hand on the knob of the door opening into her living quarters. Two witnesses state that John Hurd had his hand in his hip pocket and appeared angry. He and Bill Hurd proceeded to the pile of tobacco, the ownership of which was in dispute, and Bill said: "Pappy, this is my tobacco, you put it on the basket," to which the accused replied: "No, if it is yours you put it on." Grover Gray said: "Go on, you, I don't want any trouble." Bill Hurd repeated his request to his father and the accused repeated his answer, but stooped over and picked up some bundles of tobacco from the floor for the purpose of putting them in the basket. As he did so, Grover Gray reached for the basket and Bill Hurd shot him several times, one bullet striking him in the back and two in front, causing almost instant death. Bill Hurd was tried, found guilty of murder in the first degree, and sentenced to thirty-five years' confinement in the penitentiary.

The Commonwealth contends that John Hurd was guilty of aiding, abetting, inciting and encouraging his son in the killing. It is also claimed that John Hurd

participated in the shooting because there was a difference in the sound of the shots, one report being louder than the others. It affirmatively appears from the evidence of the Commonwealth that the room in which the shooting took place was small, twelve or fourteen feet square, and that the eye-witnesses, Orbey Hawkins and Banner Gray, were near enough to the deceased to catch him as he was falling, that immediately after the shooting John Hurd was standing still and after a moment or two left the building with no weapon in his hands. Bill Hurd testified that the deceased whirled immediately after the first shot, which explains the fact of his being shot both in the back and in front.

While the witnesses state that the smoke from the explosion of the pistol blinded them it is hardly possible for John Hurd to have concealed a weapon from the eye-witnesses so quickly after the shooting, when the Commonwealth agrees that at the time the shooting started he was stooping over. If he had a weapon in his hands it seems incredible that it was not seen. No significance is attached to the fact that he had his hand in his hip pocket when he entered the room, because it affirmatively appears that he made no hostile move, and said or did nothing after he reached the room to aid, abet, or encourage his son in the killing. The law applicable is well stated by Judge Kelly in the case of *Brown* v. *Commonwealth*, 130 Va. 733, 736, 107 S. E. 809, 810, 16 A. L. R. 1039, as follows:

" 'A principal in the second degree is one not the perpetrator, but present, aiding and abetting the act done, or keeping watch or guard at some convenient distance.' Minor's Synopsis Crim. Law, page 11. See also *Horton's Case*, 99 Va. 848, 38 S. E. 184.

" 'Every person who is present at the commission of a trespass, encouraging or inciting the same by words, gestures, looks or signs, or who in any way, or by any means, countenances or approves the same, is, in law,

assumed to be an aider and abettor, and is liable as principal.' Plaintiff's Instr. No. 1 in *Daingerfield* v. *Thompson,* 33 Gratt. (74 Va.) 136, 148, 36 Am. Rep. 783, approved by this court as the law.

"Mere presence when a crime is committed is, of course, not sufficient to render one guilty as an aider or abettor. There must be something to show that the person present and so charged, in some way procured, or incited, or encouraged, the act done by the actual perpetrator. *Kemp's Case,* 80 Va. 443, 450. But whether a person does in fact aid or abet another in the commission of a crime is a question which may be determined by circumstances as well as by direct evidence."

There is no direct evidence tending to prove that the accused aided or abetted in the commission of the crime, but the Commonwealth contends that the circumstances conclusively establish the fact. It is established that Bill Hurd had left the scene because he was threatened by Banner Gray and had gone within a few hundred yards of his father's home and returned to the mill accompanied by him. This is the only proof introduced by the Commonwealth to show concert of action between the accused and his son.

Judge Holt, in the case of *Boggs* v. *Commonwealth,* 153 Va. 828, 835, 149 S. E. 445, 447, says:

"Those who provoke a difficulty cannot be heard to say that the stress of action carried them beyond their original purpose. One who attacks may expect resistance, and if the accomplishment of his purpose, homicide, whether necessary or not, is inflicted, it is murder, though it may not have been contemplated in the original scheme of things. Of course, something more than mere presence is required. The test is concert of action, and the result must have been one of its incidental probable consequences. Wharton's Criminal Law, section 258."

The uncontradicted evidence for the accused shows that John Hurd is somewhat deaf and that on the day be-

fore the killing Grover Gray had endeavored to rent him some land and that he had promised to see him on the day of the tragedy about this; that on the morning of the tragedy John Hurd joined his son at Ed Williams' place, which is half a mile from his residence and three-quarters of a mile from the scene of the tragedy; that on the way to the mill his son requested his help in removing his tobacco, and that he knew nothing about any previous difficulty between his son and the Gray brothers.

The accused's account of the killing is quite different from that of the Commonwealth. Both John and Bill Hurd testified that when they began to straighten up the tobacco and put it on the basket Grover Gray rushed at Bill Hurd with a hatchet and Banner Gray started towards him with a stick, and then it was that Bill Hurd began to shoot.

If the jury had accepted this version of the shooting neither Bill nor John Hurd was guilty of murder. The testimony of the Commonwealth corroborates the testimony of John Hurd as to what he was doing during the shooting and immediately thereafter, which is:

"I just stood there and watched them, they never even mentioned tobacco, and I didn't know what had happened, I stood there a minute or a minute and a half, I was sorter beat and felt bad, I didn't know what to do, I didn't know whether to stand there or go on out.

"Q. Did you have a pistol?
"A. No, sir.
"Q. Were you armed in any way?
"A. No, sir.
"Q. Were you anticipating any trouble of any kind?
"A. Never did.
"Q. Did you do anything?
"A. No, sir.
"Q. Did you say anything to Bill?
"A. No, sir; didn't speak to him any more."

The burden was on the Commonwealth to

show beyond a reasonable doubt that the accused by some word, gesture, look or sign encouraged or incited Bill Hurd in the killing, and there is not a scintilla of evidence to show that he did.anything to countenance or approve the commission of the crime before, at the time, or subsequent to the killing. The only evidence tending to prove concert of action is the fact the father and son entered the building together and that the son did the killing shortly thereafter. There is no evidence which shows that the accused was jointly engaged with his son in an unlawful enterprise. He claims, and his evidence is corroborated, that he was going to the mill to see Grover Gray on a peaceful mission, entirely separate and distinct from the subject of the quarrel between Grover Gray and Bill Hurd, and that he knew nothing of any previous difficulty between his son and the Gray brothers. The burden of showing guilt of the accused, to the exclusion of every reasonable doubt, is upon the Commonwealth, and this burden never shifts. While the Commonwealth by its evidence may establish such facts as to justify an inference of guilt if not rebutted by the accused, still, if upon consideration of all the evidence there is reasonable doubt of guilt, he should be acquitted. *Potts* v. *Commonwealth*, 113 Va. 733, 73 S. E. 470; *State* v. *Wingo*, 66 Mo. 181, 27 Am. Rep. 329.

The evidence introduced by the Commonwealth to convict the accused, considered collectively, as it must be when circumstantial evidence is relied upon, is just as consistent with his innocence as with his guilt, and when this is true that interpretation which acquits the accused must be accepted. "For it is fundamental that if there be a reasonable doubt of his guilt there can be no conviction." *Canter* v. *Commonwealth*, 123 Va. 794, 96 S. E. 284, 287. It is true that after the jury have returned their verdict and the court is called upon to set it aside as contrary to the evidence, the motion is heard practically as on a demurrer to the evidence, and it is

the duty of the court to consider whether or not the evidence is sufficient to sustain the verdict. "But the rule does not leave the jury at liberty to guess, and where a fact is equally susceptible of two interpretations, one of which is consistent with the innocence of the accused, they cannot arbitrarily adopt that interpretation which incriminates him." *Burton & Conquest* v. *Commonwealth*, 108 Va. 892, 899, 62 S. E. 376, 379; *Grayson's Case,* 7 Gratt. (48 Va.) 613; *Pryor's Case,* 27 Gratt. (68 Va.) 1009; 8 R. C. L. sec. 222, p. 225; note, 97 Am. St. Rep. 778.

Applying the above rules, we are of opinion that the evidence is insufficient to warrant the conviction of the accused. Hence the judgment of the trial court is reversed, the verdict of the jury set aside, and the case remanded for a new trial if the Commonwealth be so advised.

*Reversed and remanded.*