# Richmond

GEORGE LESTER PIKE v. WALTER E. EUBANK AND WALTER S. SCOTT

January 16, 1956.

Record No. 4456.

Present, All the Justices.

The opinion states the case.

*Satterfield, Anderson & Blanton*, for the plaintiff in error.

*Rooke, Merhige & Cole* and *D. J. Esposito*, for the defendants in error.

MILLER, J., delivered the opinion of the court.

On January 16, 1954, about one o'clock a. m., while under arrest for a misdemeanor, George Lester Pike received painful lacerations, wounds and abrasions upon his head and face. He was at the first police station in the city of Richmond in the custody of police officers Walter E. Eubank and Walter S. Scott when he received the injuries. In his action for damages filed against the officers, he charged them with assault and battery and alleged that the injuries had been wrongfully inflicted upon him by the defendants.

In their written answer and grounds of defense, both officers denied the charge and alleged that Pike was accidentally hurt as a direct result of his own misconduct.

The trial was had before a jury. At the conclusion of all the testimony, the court struck the evidence as to defendant Eubank but allowed the jury to consider the evidence as it pertained to defendant Scott. A verdict was returned in favor of both defendants, and to the judgment entered thereon, we granted writ of error.

Summarized, the assignments of error are that the court erred (a) when it struck the evidence as to Eubank; (b) in the admission and rejection of evidence; and (c) in the giving and refusal of certain instructions upon submission of the case to the jury as to Scott's liability.

The first question to be decided is: Did the evidence justify submission of the case to the jury on the issue of whether or not defendant Eubank was liable? A determination of this question requires that the pertinent evidence be stated in detail.

On the evening of January 15, 1954, a party and dance for em-

ployees of a local manufacturing company was held at Tantilla Gardens in the city of Richmond where a ball room and amusement center are maintained. It was attended by several hundred employees, their consorts and friends. Pike, his wife and four other couples made up a group seated at one of the tables around the dance floor. During the evening Pike and others partook of intoxicants and about midnight an altercation arose between him and other men. Two off-duty police officers, employed by the company to keep order, observed Pike's conduct and concluded that he was drunk. He was arrested by these officers, escorted from the building, and taken to first police station by two other on-duty officers. Upon arrival at the station he was turned over to Scott whose duties were to receive, search and finger print prisoners, and aid in their incarceration. Some money was removed from Pike's pocket by Scott and placed on the desk in front of Sergeant Childress, who was then booking Pike on the charge of drunkenness.

Also present at the station was Walter E. Eubank, who was assisting Sergeant Childress in the booking and incarceration of prisoners.

In his testimony Pike said that he did not remember all that happened during that evening and night but he did remember being removed from the Tantilla ball room by two officers. Though he could not recall being transported to the station in the police wagon or being taken into the station, yet he said that he did remember "what happened when he got in there." He gave this account of how he was injured:

"A. The only thing I can remember that happened at the police station is that the man got my arms behind me and I remember glancing up and out of the corner of my eye I saw him coming down on my head with the butt of the pistol, and the only other thing I remember is someone said, 'Hit the damn rascal again,' and another thing I was picked up off the floor and I came to enough to notice that blood had flowed all around me and that is all I remember about it."

When cross-examined about the identity of the man who was holding his arms when he was struck and as to who actually hit him with the pistol, Pike testified as follows:

"Q. I believe, Mr. Pike, you have described to the best of your recollection what occurred at the police station. Do you recall or can you describe the appearance of the man who was holding you or

the person whom you said came down on your head with a pistol butt?

"A. Well, I couldn't describe the man that had my arms behind me, but the man that hit me with a pistol was a short, gray-haired man that wore glasses.

"Q. I point to this man right over here wearing glasses (indicating the defendant Scott) and ask you if that is the gentleman to whom you are referring?

"A. Yes, sir, it looks like him.

MR. MERHIGE: May I ask the witness to repeat the answer? I didn't catch it.

"A. (Continued) I said, yes.

*   *   *   *   *   *   *

"A. One man was behind me, had my arms behind me, and I don't remember anything about him. Who he was, I don't know.

"Q. He had both hands on you, did he not?

"A. I don't know how many hands he had on me, but he had both of my arms behind me.

"Q. He did not strike you but was holding you?

"A. He was holding me. I don't know who said, 'Hit the damn rascal again.'"

Eubank was called as an adverse witness. He denied that he or Scott struck Pike, but admitted that he was behind Pike holding his arms when he was injured and that the prisoner was in his and Scott's custody and control and being escorted to a cell when he received his wounds. He further said that when the prisoner was brought into the station, he was turned over to Scott, and after Scott had searched Pike, he, Eubank, found it necessary to come from behind the desk and grab Pike's arms from behind. He was taking him to the cell when he suddenly "broke away and fell, hit his head on the doorway." Pictures thereafter taken of the door on the corridor leading to the cell block show it standing open, and he explained that when Pike jerked loose, he fell forward and struck his head on the edge of the door and the facing where the door is hinged to the wall. He said that Pike's head hit there "only once" and the one blow against the door accounted for all the injuries sustained.

Scott denied striking Pike. He described Pike as being drunk, belligerent and profane, and testified that he searched Pike, removed some money from his jacket and put it on the desk before which the

prisoner was standing to be booked. Pike grabbed for it, "got the money before officer Eubank did," tore it, "and threw it on the floor." During the altercation he said Pike applied to him a vile epithet indicative of canine parentage, cursed him and Eubank, and struck at him. He stepped back and Eubank "grabbed the man from the back and started to the lock-up, cell room."

He described what then happened as follows:

"A. Mr. Pike when he started out, just about time he got to the door he jerked his right arm away from Mr. Eubank and he got over-balanced. He fell and the sharp end of that door doesn't come off smooth-like, and he hit the corner of that door and slit his head open and I said, 'Lord ha' mercy, the man will kill himself.' " He further stated that after Pike was put in the cell, he "was cursing and beating his head back and forth on the cement and the ambulance was called * * *."

Officer Bernard P. Bowles said that the prisoner was drunk, and cursed and abused Eubank, who caught him by the arms "so they could take him to the cell block." He described Pike's conduct by saying he was "twisting and lunging" and slipped away from Eubank, struck his head upon the door facing and "cut his head."

Some forty-five minutes later Bowles went to the hospital, and he found Pike still boisterous, belligerent, and profane. After reciting these facts, he was cross-questioned and answered as follows:

"Q. You have testified about him saying things to nurses and so forth. Can you tell us what he said about what the police officers had done or going to do to him?

"A. He said the police officers had beat the hell out of him and they weren't going to beat him again. That is what he said at the hospital."

The testimony of other officers and of a justice of the peace who were in the station corroborated Eubank's and Scott's statements that Pike was cursing them and jerked away, or partially loose, from Eubank and received the injuries by striking his head against the door.

Shortly after being injured, Pike was removed from his cell and taken to the Medical College Hospital for treatment. He remained in the hospital until nine o'clock in the morning, was then taken to his brother's home and sometime later that day to his own home in Amelia county.

While Pike was in the hospital two lacerations that he received

were treated and sutured. Pictures taken of him a few days later disclose that the hair above his forehead had been shaved away so that the wounds could be sutured. Ten stitches were taken in one wound and three in the other. The longer of these two lacerations begins above the hair line near the right temple and extends downward in a line that curves slightly toward the right and ends above and to the right of his right eye. The other extends from slightly above the hair line over the inner corner of the left eye straight downward onto the forehead. The pictures also show another smaller laceration or abrasion in the center of his forehead slightly above his nose and two smaller abrasions on his upper lip and a small one under his left eye.

When Pike arrived at his home on the afternoon of January 16, he was examined by Dr. James L. Hamner, his family physician, who removed the bandages, cleaned the wounds and put on fresh dressings. Dr. Hamner described his injuries as follows:

"A. His head had been shaved back probably a third of the way back, and he had a wound here on the right and a shorter one on the left of the front of his head, and he had one about midway and there were two or three places on his lip and one or two on his nose and one or two under the eye. The ones sutured were on his head and one on his eye. There was one almost directly between his eyes directly back, the back part of his head. It had not been sutured, but it was a break in the tissue.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"A. The wounds, they were more or less torn or cut wounds probably—they were not wounds which would be caused by a knife which would have a smooth edge. They were incised wounds but kind of torn wounds. One wound on this side had a slight curve on it on the right.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"A. This picture brings out what I said about the wound being slightly curved as if it had been hit, or he hit a surface which was slightly on a contour-like."

The physician also described a knot found on the back of Pike's head by saying it was about as big as the end of his finger "and the tissue was broken and it had blood oozing from it."

Pike was under arrest and in the lawful custody of Scott and

Eubank. Either or both of them were entitled to use such reasonable force as was necessary to carry out their lawful duties to effect incarceration of the prisoner in a cell. However, they do not claim that the infliction of physical injury was necessary to subdue the prisoner or to effect his incarceration. That necessity was denied, and it is in that setting that we must weigh the evidence and evaluate the just inferences that may be drawn therefrom.

In determining whether or not the evidence should have been struck as to Eubank, all conflicts in the testimony must be resolved in Pike's favor, and he is entitled to the benefit of all reasonable inferences deducible from the facts and circumstances proved.

"In considering a motion to strike out all the plaintiff's evidence, the evidence is to be considered very much as on a demurrer to the evidence. All inferences which a jury might fairly draw from plaintiff's evidence must be drawn in his favor; and where there are several inferences which may be drawn from the evidence, though they may differ in degree of probability, the court must adopt those most favorable to the party whose evidence it is sought to have struck out, unless they be strained, forced, or contrary to reason." *Green* v. *Smith*, 153 Va. 675, 680, 151 S. E. 282. *The Boulevard Apartments, Inc.* v. *Evans*, 177 Va. 315, 14 S. E. (2d) 310; *Bly, Adm'x.* v. *Southern Ry Co.*, 183 Va. 162, 31 S. E. (2d) 564; 7 M. J., Evidence, § 297.

It is not denied that upon arrival at the station Pike was delivered into Scott's custody and that officer had just searched him and Eubank was holding his arms behind him and escorting him to a cell when he was injured. Thus it is clear that he was in the immediate presence and custody of Scott and Eubank, and physically held by the latter, when hurt. Pike's testimony is that while in the custody of the two officers, and actually held by Eubank, he was hit a blow by Scott, and at that moment someone exclaimed, "Hit the damn rascal again." When this factual statement by Pike is accepted as true (and it must be so treated upon the motion to strike), then the location and character of the wounds shown in the photographs and described by Dr. Hamner justify the factual finding that Pike was struck more than one blow, and not hurt against the door.

The identity of the person who voiced the exclamation is not stated. But Pike was cursing and abusing the two officers, and at that time Eubank was having trouble holding Pike and getting him to a cell. From those proved facts the jury could reasonably infer that Eubank was incensed at the prisoner's conduct and desired to

subdue Pike and that he was the person among those present who exclaimed, "Hit the damn rascal again."

"Juries must often reason according to probabilities, drawing an inference that the main fact in issue existed, from collateral facts not directly proving, but strongly tending to prove, its existence. The vital question in such cases is the cogency of the proof afforded by the secondary facts." Moore: *Facts*, § 596, p. 595.

Though Eubank may not have known that Scott was going to strike the prisoner until Pike was actually struck the first time, and even though a jury might not infer that Eubank voiced the exclamation, yet when the exclamation was made Eubank was apprised of the probability of a second blow. It was then his duty to attempt to avoid any additional blow, but as that was concededly not done, the jury could justly infer that Eubank intentionally held Pike while he received further blows and countenanced and aided in the assault.

"Not only the principal actor or actual assailant, but also all others who aid, abet, counsel, or encourage the wrongdoer by words, gestures, looks or signs, are equally liable with him to the injured party, whether they were present when the wrongful act was done or not, and whether their motive was malicious or not." 6 C. J. S., Assault and Battery, § 27(a), p. 830.

The evidence and the reasonable inferences deducible therefrom were sufficient to put the case to the jury upon the issue of whether or not Eubank participated in the assault.

During the trial Pike and his wife were cross-questioned and asked if Pike had not "been drunk many times" and arrested in 1948 for being drunk and having illegal whiskey in his possession. Among the questions asked him were:

"Q. Is it not a fact that you were arrested and convicted of being drunk and possessing illegal whiskey in Amelia County?

\*　\*　\*　\*　\*　\*　\*

"Q. Are you in the bootlegging business, Mr. Pike?"

Objection to these questions was overruled and Pike admitted that he had been arrested for drunkenness and "convicted of having illegal whiskey" in 1948.

His wife was asked:

"Q. He has had illicit whiskey in his possession, has he not?" She answered, "I don't know."

The theory upon which this testimony was elicited was to prove

that Pike was belligerent and of a turbulent disposition when under the influence of intoxicants. It was also offered to prove that he was of bad character and to impair his credibility.

There was nothing to show that Pike was belligerent or turbulent when arrested upon these charges in 1948. Proof of independent instances of mere drunkenness or illegal possession of ardent spirits may not be used to establish turbulence of character. It is not indicative of such characteristic or disposition. Nor are convictions of such misdemeanors, *i.e.*, drunkenness and illegal possession of ardent spirits, admissible to impeach a witness. They are misdemeanors that do not involve moral turpitude. *Taylor* v. *Commonwealth*, 180 Va. 413, 417, 23 S. E. (2d) 139; *Burford* v. *Commonwealth*, 179 Va. 752, 20 S. E. (2d) 509; *Bell* v. *Commonwealth*, 167 Va. 526, 189 S. E. 441; 20 M. J., Witnesses, § 66, p. 523.

Examination about his previous misdemeanors should not have been permitted.

■ Instruction 1 was amended over plaintiff's objection by the insertion of the word "wilfully." As given, it reads:

"That if you believe from a preponderance of the evidence that the plaintiff, George Lester Pike, was *wilfully* injured by the defendant Scott, then the burden rests upon the said defendant to show legal justification and excuse for the plaintiff sustaining such injuries, and if you believe from a preponderance of the evidence that the said defendant struck and wounded the plaintiff by using some instrumentality with more force than was reasonably necessary, under all of the circumstances of the case, thereby inflicting the injuries complained of, you should find your verdict in favor of the plaintiff against the defendant Scott and assess the plaintiff's damages in accordance with the instruction on damages." (Emphasis added.)

Pike contends that Scott was *prima facie* liable if he struck him with the pistol and that use of the word "wilfully" imposed an undue burden of proof upon him.

When the act complained of imparts the invasion of a legal right, proof of the wrongful act and resultant physical injury is sufficient to make out a *prima facie* case of assault and battery. The striking of a person with a pistol is essentially wrongful and an invasion of his legal rights. The wrongful and illegal act imports lack of justification or excuse, and if legal justification or excuse for infliction of the blow be relied upon as a defense, then that must be established. *Bourne* v. *Richardson*, 133 Va. 441, 113 S. E. 893; 4 Am.

Jur., Assault and Battery, § 149, p. 197. Proof that the injury was "wilfully" inflicted was not necessary to make out a *prima facie* case.

█ Other instructions given at the instance of the defendants were objected to but no sufficient exceptions were taken and the objections will not be considered. However, the case is to be remanded for a new trial and as instruction C will most probably be tendered again, it is appropriate to say that it should not be given as presently worded. It reads:

"The Court instructs the jury that the burden is upon the plaintiff to prove by a preponderance of the evidence every essential particular of his case. If you believe from the testimony that the evidence is evenly balanced, or that the defendant's evidence outweighs the plaintiff's evidence, *even in the slightest degree*, then your verdict must be for the defendant." (Emphasis added.)

It will be observed that the instruction requires plaintiff "to prove by a preponderance of the evidence every essential particular of his case." It also tells the jury that if the evidence be "evenly balanced," he cannot recover. These two phrases placed upon plaintiff the full measure of his responsibility. The additional phrases which denied him recovery if defendant's evidence outweighed his "even in the slightest degree" tended to overstrengthen and fortify defendant's position on the burden of proof and unduly emphasize plaintiff's obligation. *Yeary* v. *Holbrook*, 171 Va. 266, 198 S. E. 441.

The objectionable phrase should be deleted from the instruction.

For the reasons stated, the judgment will be reversed and the case remanded for a new trial as to both defendants.

*Reversed and remanded.*

BUCHANAN and WHITTLE, JJ., dissenting in part.

BUCHANAN, J., dissenting in part:

As I read the evidence in this record it is insufficient, both in content and justifiable inference, to prove a case against Officer Eubank, and in my opinion the trial court was clearly right in striking the evidence as to him.

There is not a suggestion in the evidence that Eubank himself did the plaintiff any physical harm. It shows without contradiction that he was discharging his duties as an officer at the time of the alleged assault on Pike.

The evidence is uncontroverted that the plaintiff struggled with

the officers and used vulgar language when they took him from the Tantilla; that he was cursing in the patrol wagon on the way to the police station; that as he was being searched in the police station Scott took his pocketbook and plaintiff grabbed it, tore the money in two and threw it on the floor; that the plaintiff called Scott a vile name and struck at him as Scott was trying to pick up the money; thereupon Eubank grabbed him and started with him to the cell room. After plaintiff was put in the cell he was beating his head back and forth on the cement.

The plaintiff testified that he remembered only two things that happened in the police station. One was that as Eubank got his arms behind him he, plaintiff, out of the corner of his eye saw "him" (referring to Scott) coming down on his head with the butt of a pistol. The other thing he remembered was that somebody said, "Hit the damn rascal again." Everybody else in the police station that night, being six members of the Richmond police force in addition to Eubank and Scott, testified that nobody hit the plaintiff. Nobody, not even the plaintiff, testified that Eubank did more than take the plaintiff by the arms and try to put him in a cell.

The trial court held, and this court decides, that it was for the jury to say whether the plaintiff or the police officers are to be believed. Even so, there is not a scintilla of direct evidence in the case that Eubank, by word, gesture or thought process, aided or abetted Scott in that act.

In doing all that the evidence showed he did, Eubank was doing not only what he had a lawful right to do but also what it was his plain duty to do under the circumstances.

What is there to submit to a jury as to Eubank's liability? The majority opinion says inferences. It is true that inferences may be drawn from facts proved, but I can find no fact established by this evidence that will support an inference that Eubank aided in or abetted an unlawful assault on the plaintiff. He was there, it is true, but his mere presence did not make him an aider and abettor. There must be something else to show that he "in some way procured, or incited, or encouraged, the act done by the actual perpetrator." * * "The test is concert of action * *." *Hurd* v. *Commonwealth*, 159 Va. 880, 890, 165 S. E. 536, 540.

The plaintiff testified that so far as he remembered he was struck once; but the opinion says it may be inferred from his wounds that he was struck more than once.

It was proved as a fact that plaintiff was cursing and abusing the officers, and this, the opinion holds, warrants an inference that Eubank was incensed at his conduct, and that he desired to subdue the plaintiff, and these inferences warrant the further inference that it was Eubank who exclaimed, "Hit the damn rascal again." This is heavy work for inferences. We have said many times that an inference based only on another inference is not evidence. Much could be proved against many by that process.

But the opinion takes another path to the same destination. It says that even if Eubank did not know that Scott was going to hit the plaintiff the first time, and even if the jury might not believe that Eubank said to hit him again, yet when somebody did say that, Eubank was put on notice that a second blow might be coming. In the unknown interval of time between the alleged exclamation and the unproved second blow, it became the duty of Eubank to try to forestall the second blow. But concededly, says the opinion, he did not do that. (It was conceded in the sense that Eubank testified there was not any second blow, or even first blow). The opinion then concludes that a jury having arrived at that vantage point by that method could go farther and justly infer that Eubank intentionally held Pike while he received further blows and thus countenanced and aided in the assault.

It seems to me this is traveling farther afield in the realm of speculation than has been done before, and that no verdict which depended for its support on such a foundation could be sustained.

I think we should remember the principle that officers of the law, when engaged in a lawful duty which they are performing in a lawful manner, are entitled to the protection of the law that they seek to enforce.

It was stated this way in *Mercer v. Commonwealth*, 150 Va. 588, 599, 142 S. E. 369, 372:

"Let it be once established that an officer is engaged in a lawful duty and is performing same in a lawful manner, then the law throws around him every protection to which he is entitled as a minister of justice."

Before that this court said in *Davidson* v. *Allam*, 143 Va. 367, 373, 130 S. E. 245, 246:

"Officers, within reasonable limits, are the judges of the force necessary to enable them to make arrests, to prevent escapes, and to deliver.

prisoners where they are required by law or by warrant to deliver them.

"When acting in good faith, the courts will afford them the utmost protection, and they will recognize the fact that emergencies arise when they are not expected to exercise that cool and deliberate judgment which courts and juries exercise afterwards upon investigations in court."

I would affirm the judgment below as to Eubank and send the case back for retrial as to Scott for the reasons stated in the majority opinion.

WHITTLE, J., joins in this dissent.