# Richmond

WALLACE THOMAS BIBB, JR. v. COMMONWEALTH OF VIRGINIA.

April 25, 1960.

Record No. 5092.

Present, All the Justices.

The opinion states the case.

*Samuel Goldblatt* and *Robert M. White* (*Goldblatt & Lipkin,* on brief), for the plaintiff in error.

*Reno S. Harp, III, Assistant Attorney General* (*A. S. Harrison, Jr., Attorney General,* on brief), for the Commonwealth.

MILLER, J., delivered the opinion of the court.

Wallace Thomas Bibb, Jr., was convicted upon an indictment for violating § 54-488, Code 1950.[1] The indictment charged that on January 24, 1959, Bibb unlawfully and feloniously did manufacture, possess, have under his control, sell, prescribe, administer, dispense and compound a narcotic drug, to-wit, opium. Accused entered a plea of not guilty and was tried by a jury, which returned the following verdict:

"We the jury find the defendant guilty of manufacturing, possessing, having under his control and administering a narcotic drug, to-wit: opium as charged in the indictment and fix his punishment at one hundred dollar fine and imprisoned in the penitentiary for a period of three years."

Bibb's motion to set aside the verdict as contrary to the law and the evidence and grant him a new trial was overruled and judgment entered on the verdict.

In his assignments of error Bibb asserts that the evidence is insufficient to convict because (a) it does not prove that he *manufactured* a narcotic drug, *i.e.,* opium, and (b) the court erred by allowing the assistant attorney for the Commonwealth to attack his credibility by questioning him about a prior conviction for an alleged felony which was, in fact, a mere misdemeanor not involving moral turpitude.

On January 24, 1959, Bibb bought a two-ounce bottle of paregoric from Payne's Drug Store and a one-ounce bottle from Ghent Pharmacy, and he had another person buy him an additional one-ounce bottle of paregoric from Payne's. About 2 p.m. he went to the apartment of Mrs. Elizabeth Wilson, a nurse who lived at 602 Graydon Avenue, Norfolk, and while there he "cooked" a

---

[1] "It shall be unlawful for any person to manufacture, possess, have under his control, sell, prescribe, administer, dispense or compound any narcotic drug, except as authorized in this article."

bottle of paregoric. In this "cooking" process, an ounce of paregoric is heated in a pan until it boils, and then the fluid is set on fire and the alcohol and other components of paregoric are burned off and a residue of 1.8 grains of opium is left in the pan.

Detectives Henley and Woods of the Norfolk police department, who had previously made arrangements to occupy a vacant apartment next door to the Wilson suite, went to the vacant apartment about 3:30 p.m. on January 24, 1959. At approximately 6 p.m. several persons came to the Wilson apartment. A door to the left of the kitchen in that apartment, which opened into the hall, had been left ajar, and the two detectives stood near the open door and listened to conversation in the kitchen. When they heard the statement "the needle is stopped up", they entered the room. They found John Lloyd Jacobs sitting in a chair beside the kitchen table; a green necktie was wrapped around his right arm, and Mrs. Wilson had in her hand a hypodermic needle which she was withdrawing from Jacobs' arm. On a table in the kitchen beside Mrs. Wilson and Jacobs the officers found an aluminum sauce pan and a plastic measuring cup, inside of which was a cotton plug saturated with a brown substance. Henley then went over to Bibb who was sitting on a couch to the right six or seven feet away from Jacobs and Mrs. Wilson. When he searched Bibb, he found an empty paregoric bottle in his pocket. On the kitchen sink there was another sauce pan, the bottom of which was covered with a brown sticky substance. He also found other empty paregoric bottles; in the kitchen sink drawer there were small cotton plugs and hypodermic needles; in the trash can were other cotton plugs, and on top of the refrigerator were additional hypodermic needles. These utensils were examined by the State Toxicologist who testified that he found approximately six grains of opium in them.

Mrs. Wilson, a witness for the Commonwealth, testified that Bibb came to her apartment about 2 p.m., and at that time "a dose of paregoric was cooked down and was given." In explaining what was done, she testified as follows:

"Q. What do you mean 'A dose of paregoric was cooked down'?

"A. I mean it was put on the stove and fire set to it and reduced to opium.

"Q. What do you mean it was 'given'?

"A. It was injected into the vein."

The witness said that Bibb experienced some difficulty in administering the opium and she assisted him in completing the injection into his vein.

When accused testified, he said that he had purchased a bottle of paregoric at Payne's Drug Store and a bottle at Ghent's Pharmacy, and the officer found a two-ounce paregoric bottle in his jacket pocket. On cross-examination he admitted that he went to the Wilson apartment at 2 o'clock in the afternoon where he "cooked" a bottle of paregoric. He then said that the opium was injected into his vein, and he was preparing to take another injection about 6 p.m., but the officers' entry prevented him. He also said that he had been going there "once a week" or once each "two or three weeks" since April for a shot in his arm.

The component parts of paregoric are alcohol, camphor, benzoic acid, anise oil, and opium, and it may be lawfully obtained in limited quantities under prescribed conditions. Section 54-499, et seq., Code 1950. Because paregoric may be lawfully obtained, accused contends that the cooking down of that drug, which reduced it to 1.8 grains of opium does not constitute *manufacturing* narcotics within the meaning of § 54-487(5), Code 1950, and therefore the evidence is insufficient to sustain the conviction.

It should be observed that although the indictment charged that Bibb manufactured opium, it also charged, among other things, that he did possess, have under his control and administer opium, and the jury found accused guilty of not only manufacturing, but of "possessing, having under his control, and administering a narcotic drug, to-wit, opium * * *." Thus when the indictment and verdict are read together, and the evidence considered, it is clear that the evidence sustains the conviction. Even though accused might not have "manufactured" the opium, the evidence proves beyond doubt that he did possess, have under his control and administer the narcotic drug as charged in the indictment and as stated in the verdict.

As the conviction is to be reversed for reasons hereinafter stated, it is advisable that we determine whether or not "cooking" the paregoric to eliminate the other ingredients and obtain the residuum of opium constitutes "manufacturing."

In *Anheuser-Busch Assn.* v. *United States,* 207 U. S. 556, 562, 28 S. Ct. 204, 52 L. ed. 336, cited with approval in the *City of Richmond* v. *Richmond Dairy Co.,* 156 Va. 63, 74, 157 S. E. 728, Justice McKenna, in defining the word "manufacture", said:

"* * * There must be transformation; a new and different article must emerge, 'having a distinctive name, character or use.' "

Whether the "cooking" of the paregoric so as to eliminate all

ingredients except opium constitutes manufacturing as that term is usually used is not the criterion to be applied. But whether or not the reduction by this process of the paregoric to opium which may be administered intravenously constitutes *manufacturing within the meaning and intent of the statute* is what we must determine.

It is conceded that opium is a narcotic drug and in resolving this question it is to be observed that § 54-487(5) defines "manufacturer" under the Uniform Narcotic Drug Act as follows:

"The following words and phrases, as used in this article, shall have the following meanings, unless the context otherwise requires:

\*       \*       \*       \*       \*       \*       \*

"(5) *'Manufacturer'* means a person who by compounding, mixing, cultivating, growing, or other process, produces or prepares narcotic drugs, but does not include an apothecary who compounds narcotic drugs to be sold or dispensed on prescriptions."

Though it be assumed that the paregoric was lawfully obtained, yet through the process employed, the form, character and usability of the subject matter was substantially changed and transformed. An article differing materially from the paregoric was produced, prepared and caused to emerge which bears a different and distinctive name and is adapted to and intended for a radically different and forbidden use.

We hold that the process by which Bibb removed the other ingredients from the paregoric and reduced that drug to a residuum of opium susceptible to and intended to be administered intravenously constitutes manufacturing opium within the meaning and intent of § 54-488.

■ During Bibb's cross-examination by Mr. Moss, the assistant Commonwealth attorney, he was asked if he had "ever been convicted of a felony." He replied, "No, sir; not as I know of now. I don't quite understand what you mean." The cross-examination then continued as follows:

"Q. A felony is any crime that is punishable by going to a penitentiary.

\*       \*       \*       \*       \*       \*       \*

"Q. Have you ever been convicted of a felony?

"A. I don't think so.

"Q. Is it not true that in 1949, September 20, you were convicted of a grand larceny of an automobile?

"A. Yes, sir, but—"

Here counsel for accused interposed this objection:

"Mr. Goldblatt: If Your Honor please, it is not proper to ask a specific charge. Of course, he has already asked it. He can ask if he was convicted of a felony although I don't know that I put the character in issue."

After further objections and exceptions and some discussion, the court told accused that he could complete his answer. The following answer was given, and the examination and discussion continued before the jury as follows:

"A. You said grand larceny of an automobile. I was picked up and they broke it down to unauthoirzed use so I don't think I was convicted of a felony.

"Mr. Moss: He was convicted.

"Mr. Goldblatt: When was that,

"Mr. Moss: Convicted September 21, 1949, unauthorized use. He might have gone for a joy ride or something.

"The Court: That statute was changed to the extent of that particular thing. The Court recollects it was shortly after the war. If you care to recess for a minute and check that, the Court will be glad to do that.

"Mr. Goldblatt: I am. I have noted my exception.

"Mr. Moss: I will be glad to look at the Code.

"Mr. Goldblatt: You should look at it before you asked him.

"Mr. Moss: I feel it was a felony at the time so that is why I asked the question.

"Mr. Goldblatt: What Mr. Moss feels is not part of the case.

"The Court: I think both of you gentlemen have argued this case enough.

"Mr. Moss:

"Q. Have you ever been convicted of petit larceny?

"A. Yes, sir."

This was concededly a conviction other than that for unauthorized use of a motor vehicle.

At this stage of the examination and colloquy the jury was excluded. Counsel for accused insisted that at the time of Bibb's conviction, the offense, i.e., unauthorized use of a motor vehicle, was a mere misdemeanor and inadmissible in evidence. The assistant Commonwealth attorney ultimately conceded that the offense was a misdemeanor but insisted that it involved moral turpitude and was ad-

missible to affect credibility. After a discussion between the court and the attorneys, the court ruled that the offense was a misdemeanor involving moral turpitude and the conviction was admissible as affecting accused's credibility. In making that ruling the court said:

"The question of the unauthorized use of motor vehicle, which at the time this Defendant committed that crime, was a misdemeanor by statute rather than a felony was, in the opinion of the Court, no less a theft. It is a question of a purpose and the permanency of the taking, it's true.

"I think the fact that it is no less a theft is borne out by the General Assembly having seen fit to put it on the same basis as a felony, that of grand larceny."

Upon return of the jury to the court room, they were instructed as follows:

"The Court: Ladies and gentlemen of the jury: A question was asked as to the unauthorized use of an automobile, a vehicle, being a felony. The defendant having been convicted of a felony, this is not the case, and you are to disregard it.

"The Court would like to instruct the jury, and it will further instruct you in its written instruction at the proper time, that the evidence of a prior conviction, if any, that the offense of a crime may only be considered by the jury for the purpose of determining the credibility of the defendant as a witness, and it shall not be considered otherwise in determining his guilt or innocence."

To this instruction accused objected and excepted.

It thus appears that the court advised the jury that the offense was not a felony and to disregard its felony aspect. However, as the court had ruled that it was a misdemeanor involving moral turpitude, it did not strike out the evidence or tell the jury that the conviction was inadmissible and to disregard it.

Accused, who pleaded not guilty, had testified in his own behalf, and some of his testimony conflicted in part with that of one or more Commonwealth witnesses. His credibility was thus in issue, and there was no error in allowing the Commonwealth to ask accused if he had been convicted of petit larceny, an offense involving moral turpitude. *Bell* v. *Commonwealth*, 167 Va. 526, 189 S. E. 441; *Taylor* v. *Commonwealth*, 180 Va. 413, 23 S. E. 2d 139; *Pike* v. *Eubank, et al.*, 197 Va. 692, 90 S. E. 2d 821; *Parr* v. *Commonwealth*, 198 Va. 721, 96 S. E. 2d 160; 20 M. J., Witnesses, § 66.

When accused was convicted in 1949 of the unauthorized use

of a motor vehicle, that offense was then a statutory misdemeanor. Section 4480, Code 1919; § 18-236, Code 1950. It was made a felony by Acts 1952, ch. 475, p. 772, now § 18-220.1, 1958 Cum. Supp., Code 1950. It might be factually true that in some instances the unauthorized use of a motor vehicle, though a misdemeanor, would involve moral turpitude, for it may have been taken and used with an evil intent. However, under the tests to be applied to determine whether or not an offense involves moral turpitude set out and announced in the well considered opinion in *Parr* v. *Commonwealth, supra,* this offense did not necessarily involve that element. That being true and the offense having been a mere misdemeanor when committed in 1949, it was error to subject accused to examination on that conviction. *Parr* v. *Commonwealth, supra; Pike* v. *Eubank, et al., supra.*

The insistence of the assistant Commonwealth attorney before the jury that the offense was a felony and the rather prolonged discussion about the conviction in the presence of the jury, tended to emphasize unduly its importance. It cannot be doubted that its admission under those circumstances was harmful to accused. It follows that the judgment must be reversed, the verdict set aside, and a new trial awarded.

*Reversed and remanded.*