William R. McLENAGAN,
Plaintiff–Appellee,

v.

John C. KARNES, Richmond Police Officer, Defendant–Appellant,

and

Marty M. Tapscott, Chief of Police, City of Richmond; Thomas E. Shook, Captain, Police Department, City of Richmond; Andrew J. Winston, Sheriff of the City of Richmond; Loretta Smith, Richmond Deputy Sheriff, Defendants.

William R. McLENAGAN,
Plaintiff–Appellee,

v.

Andrew J. WINSTON, Sheriff of the City of Richmond; Loretta Smith, Richmond Deputy Sheriff, Defendants–Appellants,

and

Marty M. Tapscott, Chief of Police, City of Richmond; Thomas E. Shook, Captain, Police Department, City of Richmond; John C. Karnes, Richmond Police Officer, Defendants.

Nos. 93–1992, 93–1993.

United States Court of Appeals,
Fourth Circuit.

Argued April 13, 1994.

Decided June 30, 1994.

---

**ARGUED:** Glen Franklin Koontz, Office of the City Atty., Richmond, VA, for appellant Karnes; Robert A. Dybing, Shuford, Rubin & Gibney, Richmond, VA, for appellants Winston and Smith. Murray Joseph Janus, Bremner, Baber & Janus, Richmond, VA, for appellee. **ON BRIEF:** William Joe Hoppe, Office of the City Atty., Richmond, VA, for appellant Karnes; John A. Gibney, Jr., Shuford, Rubin & Gibney, Richmond, VA, for appellants Winston and Smith. Scott W. Lechner, Bremner, Baber & Janus, Richmond, VA, for appellee.

Before HALL and WILLIAMS, Circuit Judges, and GODBOLD, Senior Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

Reversed and remanded by published opinion. Judge K.K. HALL wrote the opinion, in which Judge WILLIAMS and Senior Judge GODBOLD joined.

## OPINION

K.K. HALL, Circuit Judge:

In the early morning hours of May 10, 1992, the Richmond Police Department was conducting a sobriety checkpoint at a toll plaza on the Richmond Downtown Expressway. Drivers who failed a field sobriety test were taken into an office building adjoining the plaza and tested with a breathalyzer. Those who again failed were presented to a magistrate at the scene, who issued an arrest summons.

The magistrate performed her evening's duties out of an office that she had borrowed for the occasion. She carried a holstered

revolver[1] and had placed it upon a coffee can atop her desk; the weapon was visible to all who entered the office. After the magistrate had served an individual with an arrest summons, the detainee (now arrestee) was escorted from the office and seated in a large adjoining room, ordinarily a break room for plaza employees. The arrestees remained in the break room until transported via bus to the city jail.

Richmond Sheriff's Department deputies assumed custody of the arrestees.[2] The deputies handcuffed the arrestees, maintained order in the break room, and drove the jail bus. All of the arrestees were handcuffed with their hands in front of their bodies[3] and remained that way until after they arrived at jail.

At about 3:00 a.m., as the police were preparing to close the checkpoint, Deputy Loretta Smith and two arrestees were seated in the break room. The magistrate exited her office and crossed the break room on her way to the main hallway and the women's restroom beyond; she was not carrying her revolver.[4] Moments later, one of the arrestees, still handcuffed in front, jumped from his seat and dashed past Deputy Smith into the magistrate's office. Smith did not instantly react; however, she soon realized that the magistrate had left the revolver behind.

Smith ran from the break room and turned down the main hallway toward the front door of the building, waving her arms in the air and yelling, "The man has got a gun!" several times on her way out. William McLenagan, the other arrestee who had been seated in the break room, was close behind her, hands still cuffed in front, also trying to flee the perceived danger. McLenagan was running in a crouched position because the handcuffs constricted the normal motion of his arms.

Smith, still yelling, "The man has got a gun!," ran past Richmond police officer John Karnes, who was escorting a detainee down the main hallway toward the front door, away from the break room. Karnes immediately drew his gun, wheeled and saw McLenagan almost upon him; Karnes could not see whether McLenagan had a gun in his hands.[5] Karnes shot McLenagan. Karnes nearly shot McLenagan a second time, but observed, as McLenagan fell, that he had no weapon. Karnes swore, ran toward the magistrate's office and, about six to eight seconds following the initial shot, fired two more bullets through the now-closed office door. Karnes's superiors quickly arrived on the scene and ordered him to leave the building. The arrestee who had dashed into the magistrate's office was eventually subdued.

McLenagan suffered serious injuries to his hands and abdomen. On April 7, 1993, he filed suit in district court against Karnes,

---

1. Virginia magistrates, as "conservators of the peace," *see* Va.Code Ann. § 19.2–45(7) (Michie 1990), are authorized to carry firearms or other weapons while in the discharge of their official duties. *See* Va.Code Ann. § 18.2–308(C)(4) (Michie Supp.1993) (exempting conservators of the peace from that section's prohibition against carrying concealed weapons).

2. Though the deputies are authorized to carry guns, they generally do not perform many of the duties one would traditionally associate with the title of their office. The deputies are primarily responsible for corrections, civil process, and court security.

3. This method of securing the arrestees' hands was consistent with the deputies' training. The deputies are instructed to handcuff arrestees with their hands behind their backs only when they are known to be violent, exhibit threatening behavior, or are detained in the course of a street arrest by the deputy.

4. During the course of the evening, Deputy Smith had been in the magistrate's office and had seen the revolver.

5. The only fact that appears to be disputed is the distance between Karnes and McLenagan at the critical moment. Karnes testified that, when turned, McLenagan was two or three feet away; McLenagan estimates the distance at five to ten feet. As the non-moving party, McLenagan is entitled to have the facts viewed in the light most favorable to him. *Mitchell v. Rice*, 954 F.2d 187, 190 (4th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 299, 121 L.Ed.2d 222 (1992). We accept McLenagan's estimate of the distance, but do not consider the slight discrepancy to be material. The important fact, undisputed in the record, is that Karnes could not see whether McLenagan possessed a gun.

Smith, Capt. Thomas Shook (Karnes's supervisor), Sheriff Andrew Winston, and Police Chief Marty Tapscott. McLenagan alleged that the five, either by their actions at the scene or by failing to properly train and supervise their subordinates, had violated his federal civil rights "secured by the [Four]th, [Fif]th, and [Fourteen]th Amendments." McLenagan also brought supplemental (pendent) state claims for gross negligence against all five, and for assault and battery against Karnes. The complaint purported to sue Tapscott and Winston in their official capacities only, and Karnes, Smith, and Shook in both their official and individual capacities.

The "police defendants" (Karnes, Tapscott, and Shook) and the "sheriff defendants" (Smith and Winston) filed separate answers, asserting, among other defenses, qualified immunity as to the federal claims and sovereign immunity as to the state claims. The sheriff defendants filed a motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), and all the defendants filed motions for summary judgment.

The district court ruled on the sheriff's motion to dismiss on June 16, 1993. The court dismissed only that portion of McLenagan's § 1983 claim that pertained to Smith and Winston in their official capacities; the individual-capacity § 1983 claims and the state law gross negligence claims survived the motion.

The court then, on July 23, 1993, conducted a joint hearing on the motions for summary judgment, after which it granted full summary judgment to Tapscott and Shook but denied immunity to the other defendants on both the federal and state claims. Remaining are the claims against Karnes and Smith (in her individual capacity only) under § 1983, the gross negligence claims against Karnes, Smith, and Winston (in his official

capacity only), and the assault and battery claim against Karnes.

Karnes, Smith, and Winston all appeal.[6] We hold that Karnes and Smith are entitled to qualified immunity on the § 1983 claim, and that all three are entitled to sovereign immunity on the supplemental claims. Accordingly, we reverse the judgment of the district court and remand for it to enter summary judgment for the appellants on all of McLenagan's claims against them.

## I.

Government officials who perform discretionary functions[7] are not liable under § 1983 for civil damages to the extent that their conduct does not contravene "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The first step in assessing the potential civil liability of state actors under § 1983 is to determine whether the plaintiff has properly asserted a violation of a clearly established right arising under either the Constitution or a federal statute. *American Civil Liberties Union, Inc. v. Wicomico County,* 999 F.2d 780, 784 (4th Cir.1993) (citing *Siegert v. Gilley,* 500 U.S. 226, 231–33, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991)).

### A.

McLenagan asserts that Karnes's use of his service revolver constituted excessive force, and was thus an unreasonable seizure within the meaning of the Fourth Amendment, as applicable to Karnes via the Fourteenth Amendment. The clearly established standard at the time of the encounter between Karnes and McLenagan was that a police officer's use of deadly force is not excessive where he has probable cause to believe that a suspect poses a threat of seri-

---

6. *See Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2818, 86 L.Ed.2d 411 (1985) (authorizing interlocutory appeals where the district court denies a claim of qualified immunity at the summary judgment stage).

7. Karnes and Smith, as law enforcement officers in the field who are often forced to devise unique responses to the myriad demands of their environment, are government officials who perform discretionary functions. The facts of this very case illustrate the discretionary nature of the tasks that Karnes and Smith were performing; indeed, the gravamen of McLenagan's complaint is that each, when faced with a critical decision, decided wrongly.

ous physical harm to the officer or others. *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985). To ascertain whether probable cause existed for Karnes to fire his weapon, we consider "the particular circumstances confronting the official at the time of the questioned action." *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir.1991) (citing *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). Regardless of whether probable cause actually existed, if a reasonable officer possessing the same particularized information as Karnes *could* have, in light of *Garner*, believed that his conduct was lawful, then Karnes is entitled to qualified immunity. *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039–40.

*Slattery v. Rizzo, supra*, is our leading case addressing the issue of qualified immunity in the excessive force context. Slattery was a passenger in a car parked in a lot while the driver stood nearby, making a drug deal with an undercover officer. When the police swarmed in for the arrest, Officer Rizzo approached the car from the side and could see that Slattery was holding an object in his left hand. Rizzo repeatedly commanded Slattery to raise his hands; Slattery failed to comply, instead turning his head to look at Rizzo and then returning his glance forward. When Slattery started to move his entire upper body toward the officer, Rizzo shot Slattery in the face. The object in Slattery's hand turned out to be a beer bottle.

Slattery sued, and the district court denied Rizzo qualified immunity. We reversed, holding that a reasonable officer in Rizzo's position could have had probable cause to believe that Slattery posed a deadly threat.

McLenagan argues that *Slattery* is distinguishable on three bases. First, because the incident at issue in *Slattery* did not occur in a toll plaza, but in a high-crime area known for its drugs and guns, it would be far more likely in the latter situation that an officer's potential target would be armed. Second, Officer Rizzo repeatedly commanded Slattery to raise his hands; Officer Karnes issued no such warnings. Third, while Rizzo noticed that Slattery was apparently holding some-

thing in his left hand, Karnes never actually saw anything in McLenagan's hands.

These distinctions prove no more than that every case has its own facts. Initially, we note that an area's general characteristics, while perhaps relevant in determining the existence of probable cause, become much less so in the face of a credible warning— issued in this case by Deputy Smith—that an imminent danger exists. While, under ordinary circumstances, Karnes may have had considerably less reason than Rizzo to believe that a person selected at random from the area was armed, he had, if anything, *more* reason than Rizzo to believe that a gun was present at the immediate time and place, because he could have reasonably believed that someone had actually seen it.

Regarding McLenagan's second purported distinction, we agree that a suspect's failure to raise his hands in compliance with a police officer's command to do so may support the existence of probable cause to believe that the suspect is armed. This point is implicit in *Slattery*. In that case, however, Officer Rizzo, having initiated the encounter, had sufficient time to give repeated warnings; here, Officer Karnes had no such luxury. When he turned and drew his weapon, McLenagan, in full flight, was virtually upon him. For all Karnes knew, the hesitation involved in giving a warning could readily cause such a warning to be his last. We decline, therefore, to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing—particularly where, as here, such a warning might easily have cost the officer his life.

Similarly, we do not think it wise to require a police officer, in all instances, to actually detect the presence of an object in a suspect's hands before firing on him. Karnes had been in the break room and was aware that the arrestees gathered there were handcuffed. But he also knew that they were handcuffed in front, making it possible for them to fire a gun. It is true that Karnes did not see a gun in McLenagan's hands, but it is also true that he could not confirm that McLenagan was unarmed. We will not second-guess the split-second judgment of a

trained police officer merely because that judgment turns out to be mistaken, particularly where inaction could have resulted in death or serious injury to the officer and others. Although it is extremely unfortunate that McLenagan was seriously injured, § 1983 does not purport to redress injuries resulting from reasonable mistakes.

We are nonetheless troubled by Officer Karnes's actions following the critical moment. After shooting McLenagan, Karnes quickly proceeded to the magistrate's office, and, without apparent regard for who might be behind the closed door, twice fired through it. In a considerably closer case, involving a decision taking longer than a fraction of a second, such conduct might be indicative of an officer's propensity for ill-considered actions, and thus possibly relevant to the probable cause determination. However, in *this* case, Karnes had no time to consider anything at all—except his and the public's immediate safety. At the moment of truth, Karnes acted well within the range of behavior expected of a police officer. What happened after the critical time had passed is simply irrelevant.

### B.

 Though McLenagan's § 1983 claim against Officer Karnes is easily identified as one of excessive force in violation of the Fourth Amendment, his claim against Deputy Smith defies facile classification. While McLenagan has argued that Smith had a duty under Virginia law to protect him from violence,[8] an asserted violation of state law is almost always insufficient to sustain a federal claim under § 1983.[9] McLenagan has also argued that Smith's actions are so intertwined with those of Karnes as to constitute a single "cause" of McLenagan's injuries, and therefore Smith should, in effect, be held jointly liable with Karnes for Karnes's alleged constitutional violation. The short answer to this argument is that, because we have held Karnes's actions did not transgress the Fourth Amendment, Smith cannot be held liable for a violation that does not exist. Moreover, even had we upheld the district court's judgment with regard to Karnes, it would be inequitable to deny Smith the protection of qualified immunity on the basis of an eventuality that she could not reasonably have foreseen.

### II.

 We turn now to McLenagan's state law claims against Karnes, Smith, and Winston for gross negligence, and against Karnes for assault and battery.[10] As a

---

8. Va.Code Ann. § 15.1–138 (Michie Supp.1993) provides that "officers ... constituting the police force of counties ... of the Commonwealth ... shall secure the inhabitants thereof from violence and the property therein from injury."

9. *See Davis v. Scherer*, 468 U.S. 183, 193, 104 S.Ct. 3012, 3018–19, 82 L.Ed.2d 139 (1984). State law, however, may bear upon a claim under the Due Process Clause where *property* interests protected by the Fourteenth Amendment are created by state law. *Id.* at n. 11 (citing *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). Section 15.1–138 possibly creates a cognizable property interest on McLenagan's behalf (the continued fruits of his labor) that Deputy Smith may have had an obligation to protect, but McLenagan can demonstrate *no clearly established standard* whereby Smith's actions can be evaluated for a potential violation of substantive due process. It is quite possible that, by virtue of alerting the officers near the scene of the situation, Smith's actions could have provided *more* protection for McLenagan's "property" than had she stayed behind to confront the arrestee in the magistrate's office.

As a general matter, there is no direct federal "right to protection." *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 197, 109 S.Ct. 998, 1004, 103 L.Ed.2d 249 (1989). An exception may apply where the State creates or assumes a "special relationship" with a person, as when it takes him into its custody and holds him there against his will, such as it does with an incarcerated prisoner or an involuntarily committed mental patient. *Id.* at 198–201, 109 S.Ct. at 1004–06. However, even if McLenagan's case fits within the exception, he still cannot demonstrate the existence of a clearly established standard purporting to govern Smith's actions.

10. The appellants are not entitled to the defense of sovereign immunity if they are deemed to have acted in a grossly negligent fashion. *Colby v. Boyden*, 241 Va. 125, 400 S.E.2d 184, 187 (1991). Similarly, Karnes obviously could not avail himself of the defense had he intended to commit an assault and battery against McLenagan. Simply put, under Virginia law, sovereign immunity is not available to a defendant whose culpability extends beyond mere negligence.

threshold matter, we must decide whether to exercise our discretion to address these claims. In a § 1983 action in federal court, where all federal claims are disposed of in favor of the defendants, leaving only state claims that have been briefed by both parties and are "patently without merit," the balance between judicial efficiency and comity is struck in favor of the federal court's disposition of the state claims. *O'Bar v. Pinion*, 953 F.2d 74, 85 (4th Cir.1991).

An analysis of Virginia law reveals that McLenagan's state claims are patently without merit. Gross negligence is defined as the "absence of slight diligence, or the want of even scant care." *Frazier v. City of Norfolk*, 234 Va. 388, 362 S.E.2d 688, 691 (1987). It is that degree of negligence that "shows an utter disregard of prudence amounting to complete neglect of the safety of another." *Id.* Karnes's conduct did not amount to complete neglect of McLenagan's safety; he was simply faced with an impossible choice that had to be made in the flickering of an instant. Had Karnes chosen not to shoot and McLenagan indeed been armed, resulting in injury to another, we do not doubt that we would today be deciding whether Karnes's decision in *that* case constituted "complete neglect of the safety of another."

McLenagan's claims of gross negligence against Smith and Winston are also patently without merit. Deputy Smith's attempts, consistent with her training, to alert other police officers to the situation in the magistrate's office conclusively establish at least slight diligence or scant care with regard to McLenagan's safety. It logically follows that if Smith's actions at the scene did not constitute gross negligence, then Sheriff Winston was likewise not grossly negligent in training Smith to react in such a fashion.

Finally, with regard to the assault and battery claim against Karnes, McLenagan is required to prove both a "wrongful act" and resultant physical injury.

Sovereign immunity, like qualified immunity, is only available to public officials performing discretionary functions. *Id.*, 400 S.E.2d at 186. We believe that, under Virginia's four-factor test,

*Pike v. Eubank*, 197 Va. 692, 90 S.E.2d 821, 827 (1956). A wrongful act imports lack of justification or excuse. *Id.* We hold that Karnes's actions under the circumstances were justified and that no reasonable minds could differ on the question. Thus, this claim is also patently without merit.

Because the appellants' actions in this matter did not rise to a level of culpability that would deprive them of the protection of qualified and sovereign immunity, the judgment of the district court is reversed, and the case remanded for it to enter summary judgment on behalf of the appellants.

*REVERSED AND REMANDED.*

*see id.* at 186–87, the appellants were engaged in discretionary functions at the moment McLenagan was shot. *See* note 7, *supra*.