MICHAEL, Circuit Judge,
dissenting:
This case comes to us on appeal from the grant of summary judgment for the Town of Chapel Hill, Officer Stephen Riddle, and all other defendants. Consequently, our task is a narrow one. We must decide whether the evidence offered by the plaintiffs, the parents of Mark Sigman, is legally sufficient to reach a jury. We must accept the plaintiffs’ evidence as true and make all justifiable inferences in their favor. With this narrow task in mind, this case boils down to a single question: would a reasonable police officer have perceived a threat of serious harm to himself or others that justified firing on Sig-man after he walked out of his house. The majority apparently believes that Officer Riddle was justified as a matter of law in using deadly force on the facts of this case. Tempting as it is to grant summary judgment to the police, there is enough here for a jury to evaluate the credibility of three eyewitnesses who say that Sigman had his hands up and they were empty when Officer Riddle shot him. In other words, on the present record there is a sufficient factual dispute about the threat posed by Sigman to create a genuine issue for trial.[1] I respectfully dissent.
I.
A.
Our review of an award of summary judgment is de novo. See Motor Club of America Ins. Co. v. Hanifi, 145 F.3d 170, 174 (4th Cir.1998). If the papers filed in district court show a “genuine issue as to any material fact,” summary judgment is inappropriate. See Fed. R.Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, when the parties dispute a material fact and“the evidence is such that a reasonable jury could return a verdict for the non-moving party,” summary judgment must be denied. See Anderson, supra at 248, 106 S.Ct. 2505; see also Motor Club, 145 F.3d at 174. In determining whether a reasonable jury could find for the nonmoving party, a court must “view[ ] the facts and the inferences drawn there-from in the light most favorable to the nonmoving party.” See Motor Club, 145 F.3d at 174; Porter v. United States Alumoweld Co., 125 F.3d 243, 245 (4th Cir.1997). “[T]he judge’s function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.” Anderson, 477 U.S. at 249, 106 S.Ct. 2505. Accordingly, the nonmoving party’s “version of any disputed issue of fact ... is presumed correct.” See Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). With these controlling principles in mind, I now turn to the facts in this case.
B.
On May 22, 1993, Mark Sigman had lost his job, was drunk and belligerent, and had threatened to harm himself, his girlfriend, and the police. As the majority recounts, Sigman had locked himself in his house, had repeatedly cut himself with a knife, had slashed at Officer Riddle with a knife as Riddle tried to pepper spray him through a window, and had refused police instructions to come outside. But the majority’s version of the facts is flawed from the point Sigman opened his front door to come out of the house. From that point the record reveals contradictory versions of the facts.
*790 It is true that Officer Riddle testified in deposition that Sigman came out of the house with a chefs knife in his right hand. He also testified that Sigman held the knife “out in front of him” and “below his shoulder.” Riddle was standing between the curb of the road and a line of trees when Sigman left the house. Riddle claims that he yelled to Sig-man, “Drop the knife” and “don’t come forward.” Riddle then took a defensive position behind a tree and drew his revolver. According to Riddle, Sigman did not halt but kept walking forward. Then, Riddle claims that he fired at Sigman when Sigman, armed with the knife, was ten to fifteen feet away from him.
The other police officers on the scene also testified that Sigman was armed with a knife, but their stories are somewhat inconsistent.[2] The variation in the officers’ description of the knife and the manner in which Sigman held it might affect the credibility of their stories if the evidence was weighed by a jury. But that is beside the point for now. At this stage we must accept as true the three affidavits of Kecia Roberson, Tajuana Roberson, and Charlotte Davis.[3] Each affiant states that “Sigman came out of the house, with his hands raised. I could clearly see Mark Sig-man’s hands and that he had nothing in them.” For purposes of the summary judgment motion, we must accept this as true. See Eastman Kodak, 504 U.S. at 456, 112 S.Ct. 2072; Anderson, 477 U.S. at 249, 106 S.Ct. 2505.
We also must accept as trae the three witnesses’ statements that Mark Sigman was “clearly intoxicated and staggering” when he exited the house and that he “was not more than three steps from the front door when the officer shot him.” This account is consistent with Officer Terry’s testimony that Sig-man took two to four steps and stopped before he was shot. The deposition testimony of Officers Terry, McKerlie, and Snyder add that Sigman was walking “fairly slowly,” “slow[lyj,” or “very slow[ly],” before he was shot.
For the purposes of summary judgment, the facts can therefore be summarized as follows. After a contentious and tense standoff with the police, in which Sigman threatened the police and was repeatedly instructed to come out of the house, Sigman stepped through the front door. His empty hands were clearly visible and raised in the air. Although the officers yelled at Sigman to halt, Sigman walked forward slowly, taking approximately three steps before he paused. As he began to move again, Officer Riddle shot him twice, fatally wounding him. It is under this set of facts that we must evaluate the ease.
II.
The basic issue of qualified immunity is simple. Law enforcement officers are entitled to immunity from suit whenever their *791 use of deadly force is objectively reasonable. See Graham v. Connor, 490 U.S. 386, 394-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (Fourth Amendment not violated by objectively reasonable use of force); Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396, (1982) (qualified immunity exists when “conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known”). Such force is appropriate when an objectively reasonable officer could believe that the suspect poses a threat of serious physical harm to himself or others. See Graham, 490 U.S. at 397, 109 S.Ct. 1865; Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (deadly force). The reasonableness of this perception, and not whether the perception is ultimately correct, determines whether the officer is entitled to qualified immunity from civil lawsuits. See Gooden v. Howard County, 954 F.2d 960, 965 (4th Cir.1992) (en banc); see also Graham, 490 U.S. at 396, 109 S.Ct. 1865.
The majority today affirms the district court’s dismissal on qualified immunity with two alternative rulings. First, it holds that the affidavits of three witnesses who saw Sigman exit his house with empty hands in the air “cannot effectively impact the credibility of Officer Riddle’s testimony ... as to his perceptions.” See ante at 788 (emphasis added). Alternatively, the majority holds that whether Sigman had a knife in his hand when he came out of the house is “[imjmate-rial” to the question of whether Officer Riddle reasonably perceived a threat of serious physical harm to himself or others. See ante at 787-88. I believe that the majority errs in both holdings.
A.
The majority impermissibly displaces the role of the jury by weighing the credibility of Riddle’s deposition testimony against the affidavits of three eyewitnesses. It is horn-book law that at summary judgment “the judge’s function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.” See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Indeed, we must accept the three eyewitness affidavits as true, and we must draw all justifiable inferences in favor of the plaintiffs.
Although courts must determine whether an officer’s perception of a threat was reasonable, the qualified immunity inquiry “focuses on the objective facts ” of the case in order to measure the defendant’s actions against those of a reasonable police officer in the same circumstances. See Rowland v. Perry, 41 F.3d 167, 173 (4th Cir.1994)(emphasis added). Specifically, we must ask if the defendant’s “perceptions of the objective facts” were reasonable. See id. For example, an officer under certain circumstances could reasonably (but mistakenly) perceive that a beer bottle was a knife. See Slattery v. Rizzo, 939 F.2d 213, 215 (4th Cir.1991). Likewise, a reasonable officer might perceive that an armed suspect intended to shoot him even though the suspect claimed that he was handing over his gun in surrender. See Wilson v. Meeks, 52 F.3d 1547, 1550 (10th Cir.1995).
A very different set of facts is presented here, however. Three eyewitnesses have come forward, swearing that they “could clearly see Mark Sigman’s hands and that he had nothing in them.” Officer Riddle and his colleagues swear that Sigman had a knife. The officers and the eyewitnesses were all in a position to see. A determination of what was actually happening during the event is therefore necessary to evaluate the reasonableness of Officer Riddle’s perceptions and actions Vathekan v. Prince George’s County, 154 F.3d 173, 179-80 (4th Cir.1998); Rainey v. Conerly, 973 F.2d 321, 324 (4th Cir.1992). This requires a trial to sort through the conflicting versions of events told by the officers and the eyewitnesses. See Taylor v. Farmer, 13 F.3d 117, 120 (4th Cir.1993). This determination of what happened depends on an assessment of the credibility of the respective witnesses, a matter that is inappropriate for resolution on summary judgment. Rainey, 973 F.2d at 324.
We have vastly different stories about what happened in the moments before Sig-man was shot, and it is not our place to evaluate the credibility of the competing ver *792 sions. Put simply, the plaintiffs have presented affidavits which, if true, undermine the police officers’ claim to qualified immunity. The affidavits create a genuine dispute over a material fact.
B.
The majority also errs in its alternative ruling that whether Sigman had a knife in his hand at the moment of shooting is immaterial to the question of whether Riddle reasonably perceived a threat of serious bodily harm to himself or others. Under the facts of this case, the issue is quite material to the reasonableness of Riddle’s perception of a threat justifying deadly force.
The majority bases its ruling on a quotation from McLenagan v. Karnes, 27 F.3d 1002 (4th Cir.1994), that is out of context. See ante at 788. A quick review of McLena-gan reveals that this quotation has no application to this case. In McLenagan a sheriffs deputy (Smith) was in an office building guarding two seated arrestees who were handcuffed with their hands in front of them. See 27 F.3d at 1005. When one of the arres-tees jumped up and ran into another room that Smith knew contained a loaded revolver, Smith ran from the room “waving her arms in the air and yelling, ‘The man has got a gun!’” Id. McLenagan, the other arrestee, ran after Deputy Smith in an effort to escape from danger. Because McLenagan was handcuffed, he ran in a crouched position that concealed his hands. See id. As Deputy Smith ran down a hallway with McLena-gan close behind, she passed Officer Karnes and again yelled, “ ‘The man has got a gun!’ ” See id. Karnes reacted immediately by drawing his gun and shooting McLenagan, even though he could not see if McLenagan had a weapon. In this context this court said, “we do not think it wise to require a police officer, in all instances, to actually detect the presence of an object in a suspect’s hands before firing on him.” Id. at 1007. While this conclusion was appropriate on McLena-gan ’s facts, it is not appropriate on the facts here.
In this case we must accept that Sigman came out of the house with his hands visible, empty, and raised in the air. Moreover, Sigman did not run out of the house in a threatening manner. The police officers on the scene agree that he walked out of the house slowly or very slowly. Unlike McLen-agan where the officer “did not see a gun in McLenagan’s hands” and “could not confirm that McLenagan was unarmed,” id. at 1007, Officer Riddle was in a position to determine whether Sigman was armed with a knife in his hands. Consequently, the majority’s reliance on McLenagan is misplaced.
I cannot accept the majority’s conclusion that whether Sigman was actually armed is immaterial to whether Officer Riddle’s actions were objectively reasonable. Surely any reasonable police officer would consider this to be a critical factor in assessing the threat in the facts and circumstances of this case. I would hold that the presence or absence of a weapon (or at least something resembling a weapon) is material to the question of whether a reasonable officer would perceive that Sigman posed a serious threat.
III.
On the record before us, I would reverse the district court’s award of summary judgment to the defendants. I do note that the three bystanders who say, in short affidavits, that Sigman was unarmed have not been deposed. On remand I would permit the defendants to depose these witnesses. Thereafter (and before any trial), the defendants could renew their motion for summary judgment if they have grounds to assert that a fuller account by the lay witnesses reveals that there is no genuine issue of material fact. On the basis of what we now know, however, I must respectfully dissent.

. On remand I would give the defendants the opportunity (before trial) to expand the record in an effort to support a renewed motion for summary judgment. See part III, infra.

. For example, although Riddle testified that Sig-man held the knife below his shoulder, Officer Brooks testified that he held it "up by his head in his right hand” with the blade pointing forward. Officer Terry stated that the knife was held above Sigman’s shoulder, Officer McKerlie said it was held about shoulder height, and Officer Snyder recalled that Sigman held the knife above his head and was waving it around in an aggressive manner. Similarly, their description of the knife varies a great deal. Officer Terry stated that the knife was nine inches or more in length with a "very wide blade,” adding that it was "not something that you would mistake." Nevertheless, McKerlie believed the knife was only six or seven inches long, and Snyder testified that it was "a long thin knife — not very wide” and was approximately twelve to fourteen inches long. After Sigman was shot, a knife was found on the scene by a police investigator who estimated that it was six inches in length.

. While the majority suggests that the three lay witnesses were a part of the crowd that was "cheering Sigman on, as if the confrontation were a game or contest,” ante at 787, there is no evidence that these witnesses encouraged Sig-man to be defiant. The record reveals simply that Roberson, Roberson, and Davis witnessed the shooting.
It appears that these witnesses were on the other side of the residential street bordering Sig-man's residence at the time of the shooting, although the record does not specify their exact location. While the majority implies that these witnesses were too far away to observe the shooting accurately, see ante at 785, 87-88, the affidavits contradict this. Each affidavit states that the witness “could clearly see Mark Sigman’s hands.” The evidence we have now would allow a reasonable jury to conclude that bystanders across the street were in a position to see the shooting.