Matthew **MILSTEAD**, Administrator of the Estate of Milstead, Plaintiff,

v.

Chad **KIBLER**, et al., Defendants.

No. CIV. A. 5:98CV00075.

United States District Court,
W.D. Virginia,
Harrisonburg Division.

March 30, 2000.

Jmaes Roscoe Tate, David Bafumo, Tate & Bywater, Ltd., Vienna, VA, for Plaintiff.

Mark Dudley Obenshain, Wharton, Aldhizer & Weaver, PLC, Harrisonburg, VA, for Defendants.

### MEMORANDUM OPINION

MICHAEL, Senior District Judge.

On November 19, 1999, the United States Magistrate Judge B. Waugh Crigler conducted evidentiary proceedings in accordance with an Order by this court to render a report setting forth appropriate findings, conclusions and recommendation on the dispositive issues in the case. On November 24, 1999, the Magistrate Judge filed his Report and Recommendation, concluding that the court should deny the plaintiff's motion for summary judgment and grant the defendants' motion for summary judgment on all counts. The plaintiff filed an objection to the Report and Recommendation to which the defendants responded. Under 28 U.S.C. § 636(b)(1)(B) & (C), this court "shall make a de novo review determination of those portions of the report ... to which the objection is made." After a thorough

examination of the full record of this case, the court overrules the plaintiff's objection and adopts the conclusion of Magistrate's Report and Recommendation.

## I.

On October 25, 1996, Mark Milstead and his pregnant fiancé, Jill Cardwell, were attacked by an intruder at their residence in Shenandoah County. The intruder, later determined to be Steven Ramey,[1] shot and killed Ms. Cardwell as she slept. A gunfight between Mark Milstead and Ramey ensued. After Ramey fled, Mark Milstead called 911 at 12:14 a.m. on October 26, 1996. Milstead informed the dispatcher that he had been shot in the throat and that his girlfriend had been stabbed by Ramey. During Milstead's conversation with the dispatcher, Ramey reentered the house. The defendants, two of whom are deputy sheriffs with Shenandoah County (Chad Kibler and Scott Proctor) and one of whom is a police officer for Woodstock County (Lester Whetzel), responded to the scene. However, due to Ramey's return, the only information from Milstead the dispatcher was able to relay to the officers was that a woman had been stabbed and a man shot in the throat. When the defendants arrived at the scene they had no information regarding who was the victim or the intruder because the dispatcher was unable to give them a description of the intruder.

As they were walking towards the house, the officers noted fresh blood on a vehicle parked outside the house. The officers knocked on the door and a voice from inside screamed, "Kick it in! Help!" As the defendants entered the residence, they saw the person later identified as Ramey and Mark Milstead struggling with Milstead in a superior position, kneeling over Ramey. When the defendants yelled "Police!" and approached the combatants, Milstead broke from his superior position and yelled, "He's got a gun!" The defendants immediately found a gun pointed at them by Ramey. Proctor tried to find cover and fired four shots (without effect) at Ramey before he fell backwards out the door onto the deck, losing his eye glasses. The three defendants then positioned themselves outside, in front of and around the residence. This was followed by taunts screamed by Ramey, yelling by Milstead, and Proctor alerting everyone that there was a man with a gun. Milstead shouted "he's getting more ammo" and fled out the front door. Kibler immediately fired upon Mark Milstead without warning as he exited his residence approximately 12 to 15 feet away from Kibler. Milstead was struck in the arm and chest by the bullets from Kibler's gun and collapsed on the deck in front of the open door. He then gasped to Kibler that the intruder was still inside. Kibler apparently had gotten a quick glance at the struggle inside, but thought that the man on top was the aggressor while the one underneath was the female victim. Further, he believed that Proctor had been shot. When Milstead burst through the door attempting to escape, Kibler could not tell whether he had a gun, but states that this person's hands were up in the air, though not exactly sure where.

Kibler informed Proctor of the shooting incident, but Proctor informed him to return to his position. Kibler did not radio for medical assistance at that time because he knew that arrangements for emergency medical assistance had already been made and would be available to Milstead as soon as the scene was secure. Further, Deputy Proctor conveyed an additional request for medical assistance almost immediately after Milstead was shot. Shortly thereafter, Ramey killed himself with one gunshot to the head. Allegedly, Milstead informed Kibler that "he was dying." Due to the uncertainty of whether Ramey was still on

---

1. The complaint does not reveal this fact, but plaintiff's memorandum states that Ramey had been stalking and threatening Cardwell for some time after she had broken off her relationship with Ramey.

a rampage, Kibler was again informed that he was to stay at his post. Thus, he did not move Milstead to safety, nor did he inform the other defendants or medical personnel that Milstead's condition was deteroriating. Finally, after more backup units arrived, Kibler removed Milstead from the deck. Despite these efforts, Mark Milstead died as a result of the chest wound after he arrived at the hospital.

Plaintiff Matthew Milstead filed a complaint against defendants Chad Kibler, Scott Proctor, and Lester Whetzel, invoking federal jurisdiction pursuant to 28 U.S.C. §§ 1343 and 1367, 42 U.S.C. §§ 1983 and 1988.[2] In Count I (¶¶ 32–33), the plaintiff alleged the defendants violated his deceased brother's Fourth and Fourteenth Amendment rights by using deadly force. In Count II (¶¶ 34–36), the plaintiff alleged negligence on the part of defendants in their use of deadly force causing his brother's death. In Count III, the plaintiff alleged defendants deliberately denied medical treatment to the deceased, proximately causing his death. The plaintiff seeks $10 million in compensatory damages.

Defendants answered the complaint on November 4, 1998, along with their motion to dismiss or for summary judgment. Defendants admit that they are police officers and were acting under color of law at the time of the incident involving plaintiff's brother and admit that one of the defendants shot the deceased, but deny liability. The defendants motion to dismiss was denied by this court on April 19, 1999.

Both parties now have filed motions for summary judgment. The plaintiff believes

summary judgment in his favor is proper because of the defendants' gross negligence in using deadly force, and by depriving the deceased of necessary medical attention. The defendants largely rely on qualified immunity to support their position that summary judgment should be granted in their favor.

## II.

Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* F.R.Civ.P. 56(c). The facts must be viewed in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir. 1979). The movant has the burden of showing the absence of evidence to support the non-movant's case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Cray Communications, Inc. v. Novatel Computer Sys., Inc.,* 33 F.3d 390, 393–394 (4th Cir.1994).

## A. FOURTH AND FOURTEENTH AMENDMENT CLAIMS

 The plaintiff claims entitlement to summary judgment on the Fourth and Fourteenth Amendment claims under 42 U.S.C. § 1983 because of the unreasonable and excessive deadly force used in the victim's seizure. The Fourteenth Amendment provides for recovery when the actions violating the plaintiff's Constitutional

---

2. 28 U.S.C. § 1343 grants original jurisdiction to district courts for certain actions to recover damages for injuries or because of deprivation of rights. § 1343(a)(3) specifically grants jurisdiction "to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

42 U.S.C. § 1983 imposes civil liability on any person who under color of State law causes any citizen to be deprived of rights under the Constitution or laws and creates a private cause of action for the citizen whose rights are thus violated.

§ 1988 allows a court to award attorney's fees and expert fees in an action brought under § 1981 or 1983, *inter alia.*

rights are so egregious that their egregious nature "shocks the conscience." *See County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 1717, 140 L.Ed.2d 1043 (1998). However, the Supreme Court has held that "all claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Vathekan v. Prince George's County,* 154 F.3d 173, 178 (4th Cir.1998) (quoting *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Thus, the proper avenue of recourse for the plaintiff is through the Fourth Amendment.

■ An officer's actions are judged on a standard of objective reasonableness when a plaintiff alleges that a police officer unconstitutionally used deadly force. *See Sigman v. Town of Chapel Hill,* 161 F.3d 782, 787 (4th Cir.1998) (citing *Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). To determine objective reasonableness, a court must consider what a "reasonable officer on the scene" would have done. A court should consider factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Sigman,* 161 F.3d at 787 (quoting *Graham,* 490 U.S. at 396, 109 S.Ct. 1865). Further, "[t]he calculus of the reasonableness must embody allowances for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Sigman,* 161 F.3d at 787 (quoting *Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865).

■ The Fourth Circuit utilizes the same reasonableness consideration under the doctrine of qualified immunity. *See Rowland v. Perry,* 41 F.3d 167, 173 (4th

Cir.1994). Under this doctrine, government officials performing discretionary functions are not liable under § 1983 so long as their conduct does not run afoul of "clearly established statutory or constitutional rights of which a reasonable person would have known." *McLenagan v. Karnes,* 27 F.3d 1002, 1006 (4th Cir.1994) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Qualified immunity is an immunity from suit and not merely a defense to liability. As such, "courts must scrutinize and dismiss appropriate cases on qualified immunity grounds early in the litigation." *Sigman,* 161 F.3d at 785 (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). When courts decline such scrutiny, some of the protections afforded by the defense of qualified immunity may be foregone, because the immunity includes "an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question." *Sigman,* 161 F.3d at 785 (quoting *Mitchell,* 472 U.S. at 526, 105 S.Ct. 2806).

■ In determining whether a police officer is liable under § 1983 a court must: (1) identify the specific right allegedly violated; (2) determine whether at the time of the incident the right was clearly established; and (3) decide whether "a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances," *Vathekan,* 154 F.3d at 179, similar to the reasonable analysis under the Fourth Amendment:

> To gauge objective reasonableness, a court examines only the actions at issue and measures them against what a reasonable police officer would do under the circumstances. Subjective factors involving the officer's motives, intent or propensities are not relevant. The objective nature of the inquiry is specifically intended to limit examination into an officer's subjective state of mind, and thereby enhance the chances of a speedy

disposition of the case. Though it focuses on objective facts, the immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question. Such a perspective serves two purposes. First, using the officer's perception of the facts at the time limits second-guessing the reasonableness of actions with the benefit of $^{20}/_{20}$ hindsight. Second, using this perspective limits the need for decision-makers to sort through conflicting versions of the "actual" facts, and allows them to focus instead on what the police officer reasonably perceived. In sum, the officer's subjective state of mind is not relevant to the qualified immunity inquiry but his perceptions of the objective facts of the incident in question are.

*Rowland,* 41 F.3d at 172–73 (citations within omitted).

■ The specific right violated is the right against the use of deadly force. The law clearly establishes that "a police officer's use of deadly force is not excessive where he has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others." *McLenagan,* 27 F.3d at 1006–7 (citing *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). Regardless of whether probable cause actually existed, if a reasonable officer possessing the same particularized information as the defendants had, believed that his conduct was lawful in light of *Garner,* then the defendants are entitled to qualified immunity. *See id.* at 1007.

■ The plaintiff claims he is entitled to summary judgment on the facts of this case. Although the officers' actions taken together may be considered egregious and resulted in Milstead's death, viewed in the light most favorable to the defendants, a fact finder could maintain that a reasonable officer could have believed that the force used was reasonable in light of the circumstances. When the defendants arrived at the scene, they were aware that there were two victims and an intruder inside the house. Unfortunately, apart from the female victim, the defendants were unable to ascertain who was the intruder and who was the victim because the dispatcher was unable to give them a description of the males. Kibler thought he saw a man over the female victim and that Proctor had been shot. When a man exited the house—the same man that Kibler thought was kneeling over the female victim—he shot Milstead. Under these facts, the court denies plaintiff's motion for summary judgment.

However, whether to grant defendant's motion for summary judgment is a closer question for this court. Proctor, followed by Kibler, attempted to enter the residence, but were immediately at risk when Ramey pointed his gun at them. It is evident from the 911 tape that Proctor fired four shots, missing Ramey with each one, before falling backwards onto the deck. The defendants were aware that they had left at least one live victim inside with the gunman; however, because of the dispatcher's inability to give a description of the intruder, the defendants could not tell who was the intruder and who was the victim during the brief time that they were inside the residence. The defendants immediately positioned themselves so as to secure the outside of the residence in case the assailant attempted to escape. Meanwhile, the man now known to be Ramey continued taunting the defendants to "come in and get him." When Milstead came running out of the house, Kibler inflicted a fatal wound to the chest.

As the defendants note, this case is substantially similar to *McLenagan v. Karnes,* 27 F.3d 1002 (4th Cir.1994). In *McLenagan,* the defendant accidently shot the wrong arrestee when a fellow police officer came running from the building screaming, "The man has got a gun!" Following the police officer was the plaintiff, a gunless arrestee also trying to escape from the arrestee possessing the gun. Without warning and without ascertaining whether the plaintiff actually had a gun, the defen-

dant shot the plaintiff. *See id.* at 1005. The court stated that "the hesitation involved in giving a warning could readily cause such a warning to be his last." *Id.* at 1007. As such, the court declined "to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing-particularly where ... such a warning might easily have cost the officer his life." *Id.* Additionally, the officer in *McLenagan* may not have seen a gun in the plaintiff's hands; however, he also could not confirm there was no gun. In this regard, the court elected not to second guess the split-second judgment of a trained police officer. *See id.* at 1007–08. Accordingly, the court granted the defendant's summary judgment motion based on qualified immunity even though no warning was given, nor was a gun actually seen in the plaintiff's hands. *See id.* at 1007.

In the case at bar, defendant Kibler neither definitively ascertained whether Milstead had a gun, nor did he warn Milstead before shooting him. The dispatcher was unable to acquire a description of the intruder from Milstead; thus, the officers could not tell who was the gunless victim and who was the intruder possessing a gun. Moreover, Kibler was listening to raving taunts from Ramey and Milstead's warning that Ramey was getting more ammunition which added to the intensity and chaos of the scene. As in *McLenagan*, the 911 tape clearly shows this was a crisis situation which required the defendant to react quickly or else he or others may have been harmed. Thus, the defendants claim that under these facts, qualified immunity should also apply to the defendants. Contrarily, the plaintiffs attempt to create an issue of material fact by claiming that Kibler was fully aware that Milstead did not have a gun. *See Vathekan,* 154 F.3d at 179–80 (stating "summary judgment on qualified immunity grounds is improper a long as there remains any material factual dispute regarding the actual conduct of the defendants") (citation omitted). However, as the Magistrate Judge noted the plaintiffs are unable to point to any part of the record that indicates that Kibler knew Milstead did not possess a gun. This places this case in the split-second timing scenario set out in *McLenagan. See also Sigman v. Chapel Hill,* 161 F.3d 782, 788 (4th Cir.1998) (holding a police officer need not actually detect the presence of an object in a suspect's hands before firing) (quotations omitted). Though what transpired was unfortunate, the court believes that a reasonable officer possessing the same information which Kibler possessed would have believed that the force used was lawful under the circumstances.

The foregoing analysis as to the use of force applies equally to the claim of unconstitutional deprivation of necessary medical attention, as the factual considerations underlying this claim are more fully set out *infra.* In that factual recitation and the legal analysis as to use of force, the court must likewise conclude as to the medical deprivation claim that no unconstitutional deprivation of Milstead's rights occurred.

## B. GROSS NEGLIGENCE RELATING TO USE OF DEADLY FORCE

Gross negligence is a state court claim brought in the complaint under pendent jurisdiction. Pendent jurisdiction exists where "different claims of law 'derive from a common nucleus of operative fact.'" *See Painter v. Harvey,* 863 F.2d 329, 332 (4th Cir.1988) (citing *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725–26, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)).

If the Fourth and Fourteenth Amendment claims are decided in favor of the defendants on their motion for summary judgment, the state law claims should also be dismissed. However, the court has discretion to address state law claims even where all federal claims are disposed of in favor of the defendants, and the "balance between judicial efficiency and comity is struck in favor of the federal court's dispo-

sition of the state claims." *McLenagan,* 27 F.3d at 1009.

■ Even if the federal claims were not dismissed, the defendants are protected by sovereign immunity from negligence claims, unless they were grossly negligent. *See id.* Gross negligence is defined as "the absence of slight diligence, or the want of even scant care." *Id.* "It is that degree of negligence that 'shows an utter disregard of prudence amounting to complete neglect of the safety of another.' " *Id.* The cumulative effect of several acts when taken and considered together under the facts and circumstances of the case may constitute gross negligence. *See Ferguson v. Ferguson,* 212 Va. 86, 181 S.E.2d 648, 652 (1971). Additionally, a plaintiff may still recover under gross negligence even if he contributed to the accident so long as the negligence of the defendants was the proximate cause which directly produced the accident while the plaintiff's negligence was a remote cause. *See Clohessy v. Weiler,* 250 Va. 249, 462 S.E.2d 94, 97 (1995).

■ In hindsight, the defendants made errors upon arriving at the scene of the crime. First, a trained officer in firing his gun missed the intruder not once, but four times from a close range. Then the defendants retreated from the residence, leaving Milstead stranded and unarmed with the intruder and his loaded gun. Milstead warned the defendants that the intruder was getting more ammunition and then attempted to leave the house. Without warning and without ascertaining whether Milstead possessed a gun, Kibler fired a fatal shot to the chest despite knowing that innocent victims were inside the home.

However, Milstead also contributed to this series of blunders by calling for the defendants to enter the house, then immediately releasing Ramey before the police could secure Ramey. This act put both the officers and Milstead in an extremely dangerous position, particularly when the offices were unable to ascertain clearly who was the intruder. The officers did not leave the scene altogether, but instead set up posts outside the house in an effort to stop the intruder in case he exited the residence. In considering the facts in hindsight, it is possible to conclude that the officers were negligent. However, after listening to the 911 tape, it is apparent that the officers were performing their duties to the best of their abilities in the intense war zone that had come about once Milstead freed Ramey. The court cannot find that the defendants were acting in a utter disregard of prudence for the safety of Milstead.

## C. GROSS NEGLIGENCE RELATING TO MEDICAL ASSISTANCE

■ The defendants also were not grossly negligent in obtaining medical assistance for Milstead. The same legal standard of gross negligence applies to medical assistance as it does to excessive use of force.

Upon receiving Milstead's 911 call, the dispatcher at the Emergency Operations Center called for a rescue squad. Everyone from the dispatcher to the defendants and anyone else who responded to the call were aware that the incident involved potentially serious injuries, and immediate arrangements were made for emergency medical assistance, which would be available on the scene as soon as it was secure. Further, almost immediately after Milstead was shot, Proctor conveyed an additional request for medical assistance to the EOC dispatcher.

After Kibler fired, Milstead fell on the deck next to the door and directly in the line of fire for anyone firing from inside the house. Milstead informed Kibler that the intruder was still inside, the same intruder who Kibler believed had stabbed a pregnant woman and had shot her companion. Ramey continued shouting and threatening the officers until he shot himself in the head. None of the officers heard the shot so they were unaware of his

demise and still considered the area unsecure. The officers' training taught them that they needed to wait until the scene was secure, or at the very least until enough backup was on the scene that an officer could be covered while retrieving Milstead.

Proctor and Wetzel were unable to provide the assistance necessary to safely remove Milstead. Wetzel was guarding one door of the residence and Kibler the other. Proctor had lost his glasses, initially thought he had been shot, and despite this, was still attempting to cover the back of the house. Had Wetzel or Proctor left their positions, no one could have prevented Ramey from exiting the house unobserved through the glass doors or windows, thereby becoming a greater threat to fire upon the officers. The defendants needed to maintain their thin perimeter as a minimal safeguard until more help arrived.

After help arrived, Kibler requested to recover Milstead and was still ordered to wait until the TAC Team secured the area. Despite being told to wait, Kibler retrieved Milstead by himself, thereby exposing himself to potential fire from inside the house. After retrieving Milstead from the porch, Kibler and other officers proceeded to put together a makeshift stretcher out of wood and cardboard found in the area. They carried Milstead away from the house to the road and to the T-intersection to meet the rescue squad. In his deposition, Lieutenant Rinker testified that as soon as he saw Milstead being carried from the house, he radioed the dispatcher and asked for the rescue squad to be sent in from the staging area. From that point forward, the only delay was the time that it took for the rescue squad to arrive at the scene from its staging point two miles away. That delay can not be attributable to any of the three defendants.

Based on these facts, no evidence exists proving that the defendants exhibited any degree of negligence and much less does it show "an utter disregard of prudence amounting to complete neglect for the safety of another." *McLenagan,* 27 F.3d at 1009. The officers clearly were not grossly negligent in securing medical care for Milstead. As a consequence, the court grants the defendants' motion for summary judgment on this gross negligence claim.

## III.

The demise of Mark Milstead was truly a tragedy. As evident from the 911 tape, the officers on the scene had only seconds to ascertain what was occurring. The only information they had been given before arriving at the Milstead residence was that a man and a pregnant woman had been shot and that the intruder had reentered the house. Other than gender, the officers had no information regarding the descriptions of the intruder or the victims. Immediately upon the officers entering the house, a gun was pointed at them. The officers quickly retreated while Ramey tauntingly shouted threats at them. Milstead burst through the door and Kibler reacted by shooting him. Under the chaos of the situation, this court finds that a reasonable police officer possessing the same information Kibler possessed would have believed the force used was lawful under the precedents of the Fourth Circuit. As unfortunate as the demise of Milstead is, the 911 tape indicates that the officers on the scene performed the best they could under a confusing, threatening, and chaotic situation. Accordingly, this court overrules the plaintiff's objection and adopts the Magistrate Judge's Report and Recommendation granting summary judgment for the defendants.

An appropriate order this day shall issue.

### FINAL ORDER

The court referred the above-captioned case to the presiding United States Magistrate Judge for proposed findings of fact and recommendation, subject to review by

this court, on the dispositive issues in the case. On November 24, 1999, the Magistrate Judge filed his Report and Recommendation advising the court to deny the plaintiff's motion for summary judgment and grant the defendants' motion for summary judgment on all counts.

The plaintiff filed an objection to the Report and Recommendation on December 3, 1999, and the defendant filed a response to the objection on December 15, 1999. Under 28 U.S.C. § 636(b)(1)(B) & (C), this court "shall make a de novo review determination of those portions of the report ... to which the objection is made." After a thorough examination of the plaintiff's objection, the supporting memoranda, the applicable law, the 911 tape, the documented record, and the Report and Recommendation, this court overrules the plaintiff's objection. For the reasons stated in the accompanying Memorandum Opinion, it is this day

ADJUDGED AND ORDERED

that:

(1) The result reached in the Magistrate Judge's Report and Recommendation shall be, and it hereby is, ADOPTED;

(2) The plaintiff's December 3, 1999 objection to the Report and Recommendation of the United States Magistrate Judge shall be, and it hereby is, OVERRULED;

(3) The defendants' October 15, 1999 motion for summary judgment shall be, and it hereby is, GRANTED.

(4) The Clerk of the Court is hereby directed to strike the present case from the docket of this court.

The Clerk of the Court is hereby directed to send a certified copy of this Order to the Magistrate Judge and to all counsel of record.